# Amended Complaint

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

GREENBELT DIVISION

**BRITTNEY FELDER,**                                    *

      Plaintiff,                                          *

vs.                                                                   *          **Case No.: 8:18-cv-03405-PJM**

**MGM NATIONAL HARBOR, LLC,** *et al,*          *

      Defendants.                                     *

## AMENDED COMPLAINT

Pro se Plaintiff, Brittney Felder, brings this Amended Complaint against Defendants, and alleges upon knowledge as to herself and otherwise upon information and belief, as follows:

### I.

## INTRODUCTION

This is an action to recover losses and damages in connection with the willful, repetitious, intentional and egregious treatment suffered by Brittney Felder at the hands of the Defendants. Defendants, at the expense of federal and state laws and statutes, and the Company's own governing Corporate doctrines and policies, failed to manage the Company in a way that ensured the dignity, growth, advancement, prosperity, and overall well-being of its employees. In doing so, the Defendants caused lasting and tremendous trauma, grief, and humiliation, amongst other damages, to the Plaintiff.

    **MGM National Harbor, particularly its Retail Division, has long had a persistent problem with Management, Superiors, and those in Leadership Roles, of engaging in inappropriate, unprofessional, racist and bias conduct towards certain employees of a particular sex (female), color (fair-skinned or light tone), ethnicity (African American), or look (tall and thin).**

    **The Management of the Retail Division at MGM National Harbor engaged in patterns of retaliation against employees who attempted to file complaints or reports about Management, Superiors, and those in**

Leadership Roles who engaged in misconduct. The Management would go so far as to conceal the complaints and reports from appropriate personnel, including not filing the complaints or even hiding an Employee's terminated employment status from other employees, even Corporate personnel through deceptive tactics.

The Management of the Retail Division has long been aware of this conduct, but failed to act to appropriately to remedy the situation, as the wrongful conduct continued, resulting in extremely high turnover and a work environment so hostile and toxic that actual physical conflicts between employees occurred, and is still occurring.

The Management and Department Heads of the Retail Division have effectively condoned this egregious behavior by failing to appropriately discipline the perpetrators, and thus, fostering an environment where bias, racist, sexist, and unprofessional conduct that is unacceptable under any circumstance, is willfully allowed to continue to persist.

The Plaintiff, as well as other similar employees before and after her, have been the target of retaliation because of complaining or bringing attention about the prejudice, wrong, and unprofessional conduct including the sabotaging of work, reduction of duties, derogatory remarks, denial of professional opportunities and perks, and other adverse work conditions, up to and including termination without justification.

The constant injustice unequivocally sends the message by the Defendants that bias, racist, sexist, prejudice, and unprofessional behavior by Management of the Retail Department will be condoned, and anyone, particularly those not of the desired/favored look, race (White), color (dark skin or tone), or sex (male) who complains or speaks up about the wrongful/shameful conduct will be punished, chastised, severely disciplined, humiliated, demoted, or terminated.

## II.

## <u>JURISDICTION AND VENUE</u>

1. Jurisdiction is vested in this Court pursuant to Md. Code Ann., Cts. & Jud. Proc., § 1-501.

2. This Court has jurisdiction over the subject matter and all parties pursuant to Maryland Code § 6-102 through § 6-103 of the Courts and Judicial Proceedings Article ("C.J.P.").

3. This Court has jurisdiction over the subject matter and all parties pursuant to Title VII, 42 U.S.C.A § 2000E-5(f).

4.   Venue in this Court is proper pursuant to C.J.P. § 6-201 and § 6-202. All material events occurred in Prince George's County, Maryland.

## III.

## PARTIES

5.   Plaintiff. Brittney Felder (hereinafter "Plaintiff") was and still is a resident of Prince George's County, Maryland, and at all relevant times, was an employee of Defendant. MGM National Harbor.

6.   Defendant, MGM National Harbor (hereinafter "MGM Harbor") is a Nevada Corporation. MGM's principal place of business is located at 3950 Las Vegas Boulevard South, Las Vegas, Nevada. MGM Harbor did and currently has a venue located at 101 MGM National Avenue, National Harbor, MD 20745, wherefore all the conduct alleged herein occurred. MGM Harbor is a luxury resort, with retail, dining, entertainment, and a casino. Upon information and belief, MGM has special partnerships with non-affiliated luxury companies and brands, including the SJP by Sarah Jessica Parker boutique (hereinafter "SJP Boutique"). The exact business form and relationship of, by and between MGM Harbor and SJP Boutique will be the subject of discovery. **Defendant, MGM National Harbor, was, and at all relevant times, the employer of the Plaintiff, and, at times relevant to this action, condoned, ratified, authorized and/or engaged in the discriminatory and unprofessional customs, practices, policies, and wrongful acts described in the Complaint through its Agents and/or employees.**

7.   The true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues such Defendants by such fictitious names pursuant to Code. Civ. Proc. § 474. Plaintiff alleges fictitiously named Defendants acted or failed to act in such a manner that each has contributed in proximately causing the damages to Plaintiff as herein alleged. Plaintiff will seek leave of Court to amend this Complaint to set forth their true names and capacities when ascertained.

8.   Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants sued herein, including those fictitiously named as DOES, were the agents, servants, employees, partners, joint ventures, licensees, guarantees, invitees, assignees, co-conspirators, aiders, and/or abettors of each other, and in doing the things herein alleged, acted within the course and scope of said agency, employment guaranty, venture, master-servant relationship, assignment, license, conspiracy, invitation and/or relationship and with the full knowledge and consent of the remaining Defendants.

## IV.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.   Plaintiff timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On or around June 05 or 06, 2018 (postmarked date stamp is very difficult to read), the EEOC issued Plaintiff Notices of Right to Sue, attached hereto as **Exhibit A** and incorporated herein. Plaintiff was in receipt of this letter on June 09, 2018.

10.  Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

11.  Plaintiff also sent a very detailed Complaint letter, attached hereto as **Exhibit B**,[1] and incorporated herein, to whom at all relevant times, was MGM National Harbor's President Bill Boasberg, MGM Resort International's President William Hornbuckle, and MGM Resort International's Director Jim Murren.

## V.

## PRELIMINARY ALLEGATIONS

12.  Plaintiff graduated with top honors and "Best in Class" and "Best in Show" from the Art Institute of Washington where she earned her bachelor's degree of fine arts of graphic design. Plaintiff is highly educated with an extensive array of experience. Plaintiff has several years' experience in corporate operations, project management, retail management, and leadership positions in the design, fashion, art, and marketing fields. Plaintiff has been responsible for companies' marketing, artistic, and creative direction, managing and delegating responsibilities to maximize production, meet deadlines, increase sales, expand clientele, and successfully complete various projects and tasks of whose objectives have always been met. Plaintiff's titles include Art Director, Senior Graphic Designer, Interior Decorator, Marketing Consultant, Photographer, Buyer, Store Manager, Personal Stylist, Lead Stylist, Boutique Team Leader, and Team Leader.

13.  Plaintiff, while working as Assistant Manager at a retail store unaffiliated with MGM (hereinafter "SMU"), was approached by Whitney Wilburn (hereinafter "Wilburn"), a liaison of SJP Corporate, with an employment opportunity at SJP Boutique at MGM Harbor, attached hereto as **Exhibit C** and incorporated

---

[1] Exhibit B is exclusive of the attachments referenced within the Complaint as "Appendix..." These documents will be provided in full during discovery as so ascertained

herein. Wilburn aggressively pursued and enticed Plaintiff to leave the comfort and stability of her current job, to work at SJP Boutique, which Wilburn described to the Plaintiff as a "bustling, luxury, celebrity-owned Company and brand."

14. Plaintiff interviewed with Diane Lemberg (hereinafter "Lemberg"), one of MGM Harbor's Assistant Retail Managers, who during the interview process told Plaintiff that she would definitely want to come [to MGM Harbor] as "people work here for a long time, it's a great opportunity, and [Plaintiff] would even have the option to transfer to different properties."

15. At the urgent, desperate demand of Wilburn, Lisa Jones, Director of Retail Operations at MGM Harbor (hereinafter "Jones"), immediately followed-up with Plaintiff to offer her a job at SJP Boutique.

16. Plaintiff was simultaneously offered a promotion at SMU to work in the Corporate offices of SMU as a Buyer.

17. Plaintiff explicitly told both Jones and Wilburn that she would not leave her job at SMU, and accept the job at SJP Boutique unless 'she were in a managerial position, where she would have control and freedom to directly contribute to the operations, growth and prosperity of both SJP Boutique and MGM Harbor, where she would have [job] security, be able to shine and grow under the Company.'

18. Jones, at the direction of Wilburn, desperately and aggressively lured Plaintiff to SJP Boutique by first offering the Plaintiff a contract/job as a Sales Lead with accelerated pay. However, this position did not fulfill all of the terms mentioned above, so Jones rescinded that offer, and offered Plaintiff the position as Assistant Manager of Retail of MGM / Store Manager of SJP Boutique (referred to by Jones as "AM") that would fulfill the requirements, as mentioned above, and would be a competitive offer that included a "lasting and new" position at SJP Boutique as the Store Manager, attached hereto as **Exhibit D** and incorporated herein.

19. Plaintiff turned down the offer at SMU and accepted the position at MGM Harbor as the Assistant Manager (hereinafter "AM") of Retail for MGM Harbor and Store Manager of SJP Boutique.

20. As AM, Plaintiff had many job duties/responsibilities, attached hereto as **Exhibit E** and incorporated herein, including hopes of restoring SJP, and subsequently, MGM Harbor's Retail Division, back to its original high expectations and glory in sales, public relations, employee morale, customer service, store

operations and efficacy, employee productivity, and visual splendor, while guiding SJP Boutique and the Retail Department through its growing pains and self-induced challenges.

21. The Plaintiff entered, began, and carried out her duties as AM without the assistance, training, or physical presence of her immediate and primary supervisor, Jones, as it is informed and believed, Jones was on leave of absence. Therefore, Plaintiff was directly and immediately under the direction, supervision, and approval of Patrick Fisher (hereinafter "Fisher"). Fisher allowed, entrusted, and encouraged Plaintiff to do any and all things regarding the personnel, operations, communications, policies, formalities, visuals, and so on of the SJP Boutique that the Plaintiff, at her sole discretion, deemed necessary for the orderly and forward progression of the business.

22. **Fisher was the Retail Division Head and is the final authority in all disciplinary matters, responsible for the hiring, screening, training, retention, supervision, discipline and counseling of the employees under his command. Fisher knew or should have known of the discriminatory customs, practices, policies, and wrongful acts of the Defendant described herein, and he condoned, ratified, authorized and/or engaged in such conduct.**

23. Plaintiff's leadership, communication skills, collaborative efforts, team-first mentality, unprecedented attention to business and employee welfare, and exemplary, positive attitude, was a driving and pivotal force in SJP Boutique's and subsequently MGM Harbor's retail department sudden and drastic improvement in employee morale, peer-to-peer relations, employee productivity, creating, setting and enforcing both old and new operational and communicative rules, standards and guidelines within SJP Boutique and by and between, MGM, MGM Corporate offices in Nevada (hereinafter "MGM Corporate"), and SJP Corporate office (hereinafter "SJP Corporate"), and the retail division in and of itself. As a result, sales, employee productivity, and customer satisfaction were up across the retail division.

24. Plaintiff's hard work, strong presence, encouraging words, and priceless contributions were noted, appreciated, and publicly recognized by customers, employees, management and executives of MGM Harbor, MGM Corporate, and SJP Corporate. Plaintiff had acquired a reputation as a reliable, smart, trustworthy, formidable, respectable leader at MGM, who got proven results.

25. **Plaintiff received an award, a Golden Lion Statue, presented to her the Retail Division's meeting, for Felder's teamwork, leadership skills, and positive, encouraging and uplifting words and temperament.**

26. Plaintiff was informed by Fisher that she would be hosting and preparing for her first event, held on Wednesday, September 20, 2017. This event was the first of its kind for the SJP Boutique in that it would be a two-in-one public and private event that would be held in the SJP Boutique and feature an appearance by Sarah Jessica Parker for both, and sponsored by Capitol File Magazine for the private event.

27. Fisher gave Plaintiff full control over the event and all necessary decisions and operations regarding the preparations, plans, and execution of the event. Fisher, therefore, formally connected the sponsors with Plaintiff and himself, only. This ensured open lines of communication and that any details, plans, and arrangements for the event would be disclosed, discussed, and executed in conjunction with Plaintiff.

28. Jones, who was still not present, informed and believed, on leave of absence. Therefore, Jones was not involved or included in any capacity with the arrangements of the event.

29. Under the supervision, approval, and encouragement of Fisher, Plaintiff made all necessary arrangements for the successful execution of the event.

30. September 11, 2017, nine days prior to the date of the event, Jones for the first time returns to work. Plaintiff did not know of Jones' arrival until she arrived to work and was requested by Jones to have a meeting in Jones' office. Jones, at this meeting, delivered extremely positive reports of Plaintiff's work and business contributions.

31. After the brief meeting, Jones escorted Plaintiff to the SJP Boutique were Plaintiff was met by Wilburn. Exclusive of Plaintiff's official first day of work at SJP Boutique, Wilburn had not visited the SJP Boutique. Prior to September 11, 2017, Wilburn only gave positive feedback and commendation for Plaintiff and her contributions.

32. On September 11, 2017, Wilburn began, to the dismay of the Plaintiff, during open business hours, to immediately humiliate Plaintiff in front of the other SJP Boutique employees and Jones in the SJP Boutique. Wilburn mocked and destroyed the displays, removed all the products off the shelves, and told Plaintiff what she wants done to the store including for matters regarding the inventory, damages, and so forth. Jones does not stop, interfere, or reprimand the unprofessional, extremely inappropriate conduct of

7

Wilburn. Instead, Jones, in concert with Wilburn, continued, encouraged, and joined in the appalling

behavior of Wilburn. Jones and Wilburn asked the other employees to join in on their actions, but the

employees elected not to, and instead, by their own discretion, went on break.

33. On September 11, 2017, as soon as Plaintiff reported to work, Jones and Wilburn requested Plaintiff's

attendance at a meeting. Plaintiff had no prior knowledge or notice of this meeting. When Plaintiff arrived

in the meeting, two other employees, one a stock host, and another a Sales Lead (who was not actively or

directly involved with the operations or under the management of the Plaintiff of SJP Boutique) were

present. These two employees (hereinafter "John and Jane Doe") did not leave. In this meeting, as soon as

Plaintiff sits down, another verbal assault began on the Plaintiff, including that of calling the Plaintiff a

"dictator." Plaintiff is not even allowed to talk or answer any questions when addressed. Once again, Jones

did nothing to stop or obstruct this constant, deeply unsettling, verbal attack on the Plaintiff. As a result,

and in an attempt to stop this assault, the plaintiff is forced to respectfully speak up so that she is no longer

humiliated and verbally assaulted by Wilburn, especially while in front of more employees.

34. Once the meeting (mentioned above, paragraph 31) was over, the Plaintiff returned to the SJP Boutique to

prepare for her scheduled meeting with Fisher. Plaintiff never at any time, disclosed to anyone, especially

to those not present in the meeting, about the events that had transpired.

35. Later that day (September 11), Plaintiff was approached by another Assistant Retail Manager, Lenard

Knight, who was not present at the meeting mentioned above, who disclosed to Plaintiff that Jones told him

that Plaintiff and Wilburn "We're going at it!" Soon after, another employee, a Sales Lead, not directly

under the management of Plaintiff, and was also not present in the meeting mentioned above, disclosed that

she had heard what happened, and asked if I was okay. More employees throughout the day, likewise

approached the Plaintiff and asked if she were alright. The Plaintiff was deeply troubled, humiliated, and

concerned.

36. On September 14, 2017, Plaintiff is notified by an SJP Boutique employee that the boutique had been

completely changed at the order of Jones and that this was carried out by John and Jane Doe. Plaintiff is

becoming more and more distressed, as she not only had to deal with verbal assaults, but now she was

being prohibited from doing her job and fulfilling her responsibilities. As a result, to seek a quick resolution

and intervention, Plaintiff went to Fisher to plead for his help, to inform him of what was happening, and to

seek a reason why these things were occurring. At the request of the Plaintiff, Fisher had a discussion with Jones.

37. Later that day (September 14), Jones called an impromptu meeting in her office with all SJP Boutique personnel, which would be about the upcoming SJP Boutique event. In this meeting as well, for unexplained reasons, were John and Jane Doe. When Plaintiff entered Jones' office alongside the other employees, Jones greeted and spoke to everyone but Plaintiff. Jones handed out pens to take notes to everyone but Plaintiff. Jones ignored Plaintiff, and any time the Plaintiff spoke or was asked a question, Jones would cantankerously rebut anything the Plaintiff said. Jones continued this behavior throughout the meeting. The employees present were so uncomfortable and ashamed of what was occurring that they did not participate in the meeting.

38. After the meeting (mentioned above, paragraph 35) was adjourned, while the rest of the SJP Boutique employees left Jones' office, John and Jane Doe stayed behind. Plaintiff asked John and Jane Doe if they could excuse themselves so that she could speak with Jones. It was during this conversation that Jones verbally expressed her anger with Plaintiff for going to Fisher. In Jones' own words, "But (Plaintiff] went to [her] boss!"

39. On September 15, 2017, per the request made by Plaintiff during her conversation with Fisher (paragraph 34), a meeting between Fisher, Jones, and Plaintiff occurred. At this meeting, the Plaintiff openly expressed her suggestions and concerns so that any and all issues would come to an abrupt halt. Jones responded to Plaintiff's words by saying that she wants to make sure she is doing whatever she can to support me, and that she doesn't want me to feel that I have to have *that* response. She then told Fisher that the "[Plaintiff] scared her!" Jones made this statement to Fisher although Plaintiff never, not at any point, case, time, or in any capacity acted or responded in a hostile manner towards Jones, or anyone else, despite having to endure and be on the receiving end of the severely hostile treatment. Jones further stated that she did not want to make Plaintiff feel so hurt. After the meeting adjourned, Plaintiff hoped that everything would be better.

40. Despite all the prior meetings, the questionable and objectionable actions of Jones did not stop. Jones, Wilburn, and John and Jane Doe, and another employee known for problematic behavior (hereinafter "Doe 3"), continued to disrupt the agreements, arrangements, operations, visuals, team camaraderie, and all prior approved and finalized arrangements and procedures for the SJP Boutique event, SJP employees, and the

boutique itself, including taking away or assigning tasks that should have been completed by the manager, and giving these assignments to Jane and John Doe, and Doe 3.[2]

41. On September 18, 2017, in another meeting, Jones called Plaintiff to report to her office. After the meeting adjourned, as the Plaintiff was leaving, John Doe entered Jones' office and asked Plaintiff what she was wearing to the SJP Boutique event. Before the Plaintiff could answer, Jones intercepts, and tells the employee, "You know the *Queen* cannot be in the same color as everyone else. This is the *Queen*."[3] Plaintiff was deeply grieved by this statement.

42. On September 20, 2017, the day of the SJP Boutique event, the Plaintiff literally spent the entire night and early morning to complete, address, perfect, and ensure that everything was good-to-go with every aspect of the final touches of the event, down to the most minute of details. Plaintiff then prepared to leave to go home to get herself ready for the anticipated SJP Boutique event. As the Plaintiff was in the stockroom to gather her things to leave, Jones, without greeting or addressing the Plaintiff, comes immediately into the store and begins dismantling everything the Plaintiff had done. Jones took down and removed all the displays, rearranged all the furniture, and moved and removed the products around/from the boutique's sale floor. While doing this, Jones continued to ignore Plaintiff, not even looking at her. The Plaintiff in full distress and utter disbelief at the outrageous acts of Jones, pleaded and begged Jones to explain what was wrong and why she was doing what she was doing. Jones continued to ignore Plaintiff, with the exception to then look at Plaintiff and roll her eyes. As Plaintiff continues to humbly beg of Jones for an answer, Jones, calls MGM Harbor security to report Plaintiff as an "irate" employee. The Plaintiff is in utter shock and panic to the point of buckling at her knees. The Plaintiff turns and finds armed police officers with police dogs, security guards, and MGM Harbor security at the door. The Plaintiff, scared for her life, immediately and hurriedly goes to the stockroom to call Fisher and ask for his help, and report what was happening. Fisher tells the Plaintiff that he has a meeting, and if we could just get through this day. The Plaintiff once again stressed the seriousness of what was transpiring to Fisher. Fisher said that he would be there after his meeting, and in the meantime to do what Jones asks. The Plaintiff, still an active employee in good standing, was then escorted out of the building by several male and female security guards in full

---

[2] Refer to Exhibit A, attached hereto and incorporated herein, for more, or, specific details of the events alleged.

[3] The word "Queen" in the African American culture is a derogatory term when used between African Americans of different colors. It harkens back to slavery when lighter skin or fair toned Blacks were viewed by Whites as being better, prettier, or placed above darker skin Blacks.

view of fellow employees, staffers, MGM employees, and visitors. Plaintiff was wrongfully, and without cause, publicly shamed, humiliated, embarrassed, put in a state of extreme fear and terror, and her welfare endangered. The SJP Boutique event Plaintiff had worked so hard and tirelessly to plan and execute, was for naught, as she was prevented by Jones from attending the event.

43. Plaintiff is contacted by an SJP employee who informs the Plaintiff that Jones recorded the incident on her personal cell phone and showed the recording to numerous employees. Jones maliciously, deliberately, and in conscious disregard for Plaintiff's rights, publicly shared with countless others the humiliating events of September 21, 2017. This deliberate action, along with the events from September 21, 2017, and prior, jeopardized the Plaintiff's well-established, well-earned professional and personal reputation with local, national and international professional communities, customers, clients, guests, employees, and management and executives of MGM Harbor, MGM Corporate, and SJP Corporate. The manner in which Plaintiff was met and escorted out of the building was libel per se and slanderous per se in several respects by implying that the Plaintiff was a criminal and a danger to fellow MGM staff, customers, and visitors.

44. Defendants' actions have pervasively and irrevocably destroyed the Plaintiff's professional and personal reputation, caused the Plaintiff severe emotional distress, and wreaked unbelievable havoc on the Plaintiffs financial status and income. Defendants without cause or due process deprived Plaintiff of her rights as an MGM Harbor employee, as a human being, and citizen of the United States.

45. On September 21, 2017, Jones called the Plaintiff to meet her in her office. Jones then proceeded to tell the Plaintiff that she is "doing what is called a probationary separation, which means [she] is relieving [me] of [my] position during the probationary time period, which is the 90-day time frame…That requires my signature." Jones also took the Plaintiff's badge.

46. Plaintiff was never at any point during the hiring process or while she was employed with MGM Harbor, presumed to be, officially notified, or informed, that she was under a 90-day probationary period at any time prior to the day of her dismissal. As such, the Plaintiff refused to sign the paper as she did not know or understand what she was signing and the conditions or pretenses for which the Defendant alleged the Plaintiff was dismissed.

47. Plaintiff sent a formal Complaint to MGM Harbor and MGM Corporate. The Complaint was received and responded to by MGM Corporate on behalf of MGM Harbor, attached hereto as **Exhibit F** and incorporated herein.

48. Plaintiff called and received information via email regarding ALL the papers and agreements signed by Plaintiff during her onboarding, attached hereto as **Exhibit G** and incorporated herein.

49. Plaintiff called MGM Corporate and MGM Harbor to inquire of her personnel files, attached hereto as **Exhibit H** and incorporated herein. Plaintiff was told via telephone communication that there was "nothing negative to report in her personnel file, and that they do not provide copies of the file because any actions are recorded in Workforce."

## VI.

## PRELIMINARY ALLEGATIONS

## REGARDING TORTIOUS MISPREPRESENTATION / FRAUD

50. **Plaintiff explicitly told Jones that she would not leave her current job, where she was being offered a promotion, unless she were offered a managerial position where she would have job security and be able to shine and grow under the Company.**

51. **Defendant offered the Plaintiff the position of Assistant Manager of Retail and the Store Manager of SJP Boutique.**

52. **Jones told Felder that the position would be a competitive offer and would be a "lasting" position at SJP Boutique.**

53. **Plaintiff accepted the job and declined her promotion from her former employer on the sole basis of potential growth and longevity within the MGM Corporation.**

54. **Plaintiff, at no time, was under the impression, or given a single notice that she would be under a 90-day probationary period.**

55. **Jones, however, was well-aware of the 90-day probationary period; but at no time disclosed this to Felder, despite knowing the Plaintiff's requirement to accepting the job was having job security.**

56. **Felder had no knowledge that her employment with MGM National Harbor was immediately conditional and would implement a critical stipulation that could jeopardize her employment status with MGM National Harbor by means of the 90-day probationary period.**

57. By hiding and withholding this information from the Plaintiff, the Plaintiff unknowingly accepted a job where her status and position was immediately in jeopardy—whether warranted or unwarranted.

58. Jones, Wilburn, and Lemberg gave the pretense to Felder that by leaving her former place of employment, she was accepting not only a better job with a "competitive offer," but, she would have opportunities not afforded or possible with her other employer, and most importantly, would have job security. And seeing the desperation of Wilburn to hire her and Jones presenting that a "new position" was being made just for Felder with a competitive salary, and Jones agreeing to Felder's requirements, then the Plaintiff had every right to rely upon Jones' information and job offer/prospects as being completely truthful. Thus, Felder accepted the job.

59. The Plaintiff—although having an outstanding work reputation with not one negative comment or disciplinary against Felder during her entire tenure, and even receiving glowing accolades for her work performance—was terminated, not based on any work-related deficiencies, but rather, according to Jones, due to a "probationary separation based off of a 90-day probationary period."

60. Plaintiff as a result, suffered adverse changes in work conditions including termination (loss of employment), left her former employer and declined a promotion from her former employer, on the sole basis of accepting a job with MGM National Harbor for a position the Plaintiff did not seek, but rather, was aggressively sought out, pursued, and persuaded by the Wilburn and Jones to accept a "lasting" job with MGM National Harbor as the Assistant Retail Manager and Store Manger of SJP.

61. As a direct and proximate result of Jones' deception, the Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of employment benefits, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment, and damage to her reputation.

62. The Plaintiff has applied for numerous jobs of similar positions immediately after being terminated from MGM National Harbor. However, while Felder has the experience, what appears to be a lack dedication to a Company due to a lack of time required in similarly desired positions with a prestigious Company such as MGM, causes employers to question the Plaintiff's ability to last with a Company, despite Felder's proven and noted track record regarding her work performance and contributions.

VII.

## PRELIMINARY ALLEGATIONS REGARDING BREACH OF CONTRACT

63. The Plaintiff was offered the position of Retail Assistant Manager by Defendant.

64. Along with this position, are duties/responsibilities, education and/or experience, certificates, licenses, registrations, knowledge/skills/abilities, and work schedule/hours outline in the Job Description of the Job Posting that any qualified applicant should at minimum be able to fulfill. See Exhibit E.

65. While it is true that a job description posted by an employer does not obligate the employer to limit employee responsibilities to those stated in the job description; a job description does obligate the employer to hold the potential employee/candidate to be able to successfully handle at least the minimum of the duties/requirements needed to minimally satisfy the responsibilities of the job position at hand and as established and noted within the job posting and its subsequent description, to ensure that a fair, safe, and ethical procedure by MGM National Harbor to employ the most qualified candidate w/o bias or prejudice; and allows the potential employee/candidate to know what is minimally expected of them to fulfill a positive work performance.

66. Thus, a Job Posting is not a binding contract in which to limit requirements, duties, or responsibilities to those stated in he job posting; but, rather, a Job Posting, and the information within it is a binding contract for to state and establish the minimum requirements, duties, and/or responsibilities of a given Job Position. As such, any candidate applying for the said Position in the said Job Posting would and should expect—when the opportunity presents itself—to be responsible to fulfill the minimum said requirements, duties, or responsibilities as outlined in the job posting.

67. The Plaintiff never on her own accord or at the prompting of the Defendant was ever asked to perform duties outside of the listing. Therefore, the Plaintiff never brought a Complaint or objection forward to the Defendant about not being able to perform duties outside of the Posted Job Description.

68. The Plaintiff, instead, complained to Fisher that the minimum responsibilities she was privy to, and assigned and approved by both Fisher and MGM Corporate Management to fulfill—and consequently was successfully completing—such as the responsibility to "manage, communicate, and execute retail events" as clearly outlined and defined in the Position Responsibilities/Duties of the Job

14

Posting, was, for no due cause either inhibited, taken away, or sabotaged from the Plaintiff by Jones and given to Jane and John Doe who are not managers on any level, and who are not qualified to competently fulfill the duties of the position granted and assigned to the Assistant Retail Manager.

69. Seeing that the Retail Events were the single, most important and demanding task assigned to an Assistant Retail Manager that would truly spotlight the quality of the employee's work performance, creativity, efficacy, leadership skills, problem-solving skills, and overall knowledge, expertise and production as the Assistant Retail Manager to MGM National Harbor Executives, SJP Executives, and MGM Corporate Personnel, it goes without saying that this is the primary duty and responsibility that is afforded and designated to the Assistant Retail Manager; and that when the opportunity came for the Plaintiff to be able to fulfill this aspect of the job's duties, then according to the Job Posting, the Plaintiff rightfully should expect and be granted the responsibility she is minimally required to perform and that which is minimally written/stated.

70. Therefore, since the Plaintiff was performing or attempting to perform her rightful duty as strictly said and outlined *within* the Job Posting, then that is a binding agreement between the employer and employee.

71. Further, the Job Posting notes *"This job description in no way states or implies that these are the only duties to be performed by the employee in this position."* The aforementioned statement applies strictly to duties *outside* of those *not* listed within the Job Description of the Job Posting. It is in no manner applicable or relevant to the written statements which form a legal binding contract regarding the *minimum* tasks for skills, duties, requirements, experience, work schedule, and applicable certifications that are specifically and directly stated in the Job Description of the Job Posting to be applied, assigned, or tasked to the chosen candidate who fulfills and assumes the specified Position as stated within the Job Posting.

72. Therefore, a contract is indeed formed for the minimum requirements, duties, and tasks as outlined in the Job Posting, and the Plaintiff rightfully should have been allowed to fulfill her contractual obligation of duties that were within her scope of work and requirements as explicitly stated in the Job Posting.

73. Instead, Jones, for no just cause, would not allow Felder to perform her tasks of "managing, communicating, and executing retail events" by either sabotaging her work, giving her tasks to other, less qualified employees, and even taking the Plaintiff's duties away all together, although the Plaintiff had proven to be efficient, knowledgeable, experienced, and fully capable of the task at hand of managing, communicating, and executing retail events.

74. The Plaintiff, thus, was prohibited by Jones from completing the single most important duty that according to the Job Description, is the sole responsibility of the Assistant Retail Manager. Therefore, breaking the bonds of the contract, and causing a breach of contract.

75. A contract did exist, and the contract was breached by the Defendant the moment the Defendant stopped or did not allow the Plaintiff to perform the written, specifically stated task/job, without just cause.

76. Further, the job posting states *"The incumbent is expected to perform other duties necessary for the effective operation of the department."* This statement further gives proof of the legality of this Job Posting and that it does indeed form a contract that states the minimum requirements for the potential candidate, and the responsibilities tied to the Job Description and Job Position.

VIII.

## PRELIMINARY ALLEGATIONS REGARDING DEFAMATION/SLANDER

77. The Plaintiff during her entire tenure was praised for her contributions to the Company and the Retail Division by MGM Corporate Personnel, Executives of MGM National Harbor (including Felder's Superior Patrick Fisher), and fellow MGM National Harbor Managers and employees from within the Retail Division and outside the Retail Division.

78. The Plaintiff was known as an extremely kind, caring, mild-mannered, polite, professional, hard-working, resourceful, knowledgeable, experienced, and positive person whose managerial style led to drastic improvements in employee morale and production.

79. The Plaintiff never received not one noted or documented negative report, comment, or concern regarding her work ethic, work performance, or work production.

80. The Plaintiff never had one negative incident or confrontation with any fellow employee, Manager, or Client. The Plaintiff had a reputation of building relationships, not tearing them down.

81. The Plaintiff was so influential and highly regarded by the Retail Division as a whole, that during a Retail Division/Department meeting, the Retail Division presented her with an MGM Golden Lion miniature statuette for her positive and upbuilding demeanor and team building methods that greatly impacted the employees in the Retail Division.

82. The Plaintiff's reputation was impeccable.

83. The Plaintiff did not ever receive negative feedback or comments towards her or her work at any time prior to Jones and Wilburn returning to work the week before the Plaintiff was finalizing arrangements already approved by Fisher for the upcoming SJP retail event. Yet and still, Jones and Wilburn never gave the Plaintiff negative remarks regarding her work or work performance in private meetings when just Felder and Jones or just Felder and Wilburn were present. Hence, why Felder has a perfect and clean work record and file. It was not until when Wilburn and Jones would arrange "surprise", unexpected, or unscheduled meetings with the presence of several other MGM National Harbor or SJP employees that Jones and Wilburn would do a 180, and attempt to embarrass, mitigate, humiliate, or harshly criticize the Plaintiff, her decisions or her work. For example:

    a. August 23, 2017. See Complaint, Exhibit A.

       Wilburn never contacted Felder to discuss the problems with the merchandise privately or beforehand with the Plaintiff. Instead, through a public email addressed to MGM Corporate personnel, MGM National Harbor Management, and SJP Corporate personnel, Wilburn attempted to blame the Plaintiff and her National Harbor SJP staff and insinuate that the Plaintiff and her Staff were "mishandling" the merchandise. This email blaming the Plaintiff and her current SJP Boutique Staff was extremely disturbing because the merchandise in question was an issue that began *before* the Plaintiff was even employed by MGM National Harbor, and was an issue that began and under the direction of the *prior* SJP Manager, *not* the Plaintiff and her current Staff. The Plaintiff would respond to all addressed in the email, to correct the potential serious issue Wilburn was raising for the Plaintiff and her current Staff. This would prove to anger Wilburn, and Wilburn would shortly thereafter in the

future, retaliate against the Plaintiff by attempting to ruin the Plaintiff's work and
reputation.

b.   On September 11, 2017. See Complaint, Exhibit A.

Wilburn would repeatedly and without cause publicly scorn, antagonize, criticize, and object
to any of Felder's suggestions, comments, replies, and the like to the point that the Plaintiff
was unable to speak, even when prompted to do so by Wilburn. Wilburn would dismantle
and destroy all the Plaintiff's displays and arrangements of store products, although all of
the displays and arrangements were approved and lauded by Wilburn herself as well as
Jones and Fisher. Felder and her Staff would send Wilburn pictures of all of the displays
and arrangements within the store for her suggestions and approval. Therefore, Wilburn
had no just cause for the negativity and destroying of the store and the products within the
store, as she had personally approved and seen them beforehand.

c.   The Plaintiff and her Staff always made sure to get approval and input from Wilburn, as she
was the liaison between SJP Corporate and MGM National Harbor. The Plaintiff always
worked collaboratively with Wilburn to the legal extent that MGM National Harbor would
allow with MGM Corporate and outside Brand partnerships. However, the Plaintiff—as
directed by Melissa Willens, an MGM Corporate Representative and Executive—was
ordered to have the final say in all store related matters regarding the SJP Boutique.

d.   On September 12, 2017. See Complaint, Exhibit A.

In a surprise meeting with Wilburn, Jones, and John and Jane Doe, the Plaintiff was
shocked at the continued verbal assault on her for no due cause. At this meeting, Wilburn, in
front of other employees, called the Plaintiff a "dictator". This characterization was not
only false, but it held no merit or basis, as the Plaintiff was known and publicly awarded and
recognized by all in the Retail Division—even more so amongst the SJP Boutique Staff—as
being a quintessential team player. Wilburn was attempting to dismantle the Plaintiff's
reputation by intentionally communicating unmistakably false and damaging statements
about the Plaintiff in front of other employees. Wilburn, therefore, was acting with malice in
an attempt to smear the Plaintiff's good name/reputation.

e.  Immediately after the public scorn and humiliation by Wilburn in a public setting amongst other employees, as the Plaintiff was alone and walking to the elevator to return to the SJP Boutique, Wilburn approaches Felder in private, and then begins to apologize to Felder, even asking if she were okay.

f.  On September 11, 2017, in a private meeting between Jones and the Plaintiff, (*See Complaint, Exhibit A*), Jones candidly and vividly praises the Plaintiff for all her contributions and all that she had done, describing the store as "absolutely beautiful" and praising the "moments" Felder had created throughout the boutique, even noting that the stockroom is "pristine." Jones, in private, flowered the Plaintiff with praise, saying not one negative remark about Felder, her work, or her work performance. Jones heaped praise upon the Plaintiff, especially for all her contributions to the store and the employee production and morale.

g.  While Jones privately praised the Plaintiff for her work and contributions, Jones did not stop Wilburn from subjecting the Plaintiff to public scorn and humiliation. The reason being, that Jones would shortly follow suit.

h.  Although Jones was present in the meeting with Wilburn, Felder, and Jane and John Doe, and witnessed the verbal attack on the Plaintiff by Wilburn, Jones at no time intervened. Despite, the Plaintiff never reciprocated the hostile or cantankerous nature and tone to Wilburn or anyone else. In fact, the Plaintiff would not speak until asked to do so by Jones or Wilburn; and when the Plaintiff spoke, she did so with a mild temper and deep respect. The Plaintiff was never aggressive in her tone, posture, or demeanor, which is why it was Wilburn and Jones who were the ones apologizing and attempting to console the Plaintiff. But, although this was the case, Jones went to another employee who was not present at the meeting and told him that the Plaintiff and Wilburn were "going at it." The Plaintiff at no time "argued" with Wilburn, rather it was Wilburn who was the aggressor and who was berating the Plaintiff. The Plaintiff never lost control of her temper or engaged with Wilburn during Wilburn's quarrelsome banter. Therefore, Jones' statement was not only inaccurate, but downright false as it tried to paint Felder in an unfavorable, disputatious

19

light to other employees, which was completely contrary to Felder's kind, mild-mannered disposition that everyone associated the Plaintiff with having. The Plaintiff never engaged in an argument with an employee at any time. However, before the Plaintiff could settle back into her office, the Plaintiff was being questioned by several other concerned employees—all of whom were not present at the meeting—if the Plaintiff was okay, and what exactly happened. Due to Jones' misleading and malicious statement, the Plaintiff had to suffer further scorn and humiliation as Jones' defamatory statement became rumor and thus had spread throughout the Retail Division; leaving the Plaintiff to try to dispel the false statement re-focus the Retail Division.

i.   The Plaintiff could not yet pinpoint why Wilburn and Jones were making her the target of harsh, unwarranted, and cruel treatment, especially since Jones and Wilburn had been absent from the MGM National Harbor and the boutique since the Plaintiff's first day. It was more disturbing because the Plaintiff had never been criticized for her work, work ethic, temperament, behavior, or work performance. Everything the Plaintiff had done was always commended, and was also, always approved by her Superiors, including Wilburn. The Plaintiff herself had an immaculate reputation, so the attempts by Wilburn and Jones to defame and slander her were completely baseless.

j.   The treatment from Jones only got drastically worse after the Plaintiff was left with no other option but to talk to another party, her Superior, Fisher, about Jones' egregious behavior and the shameful incidents that were transpiring. Jones, although in private praised the Plaintiff for "all her concentrated efforts,"  as written in an email Jones sent to Felder two days before the Retail Event; Jones would publicly berate Felder, especially in the presence of Fisher, other Management or Corporate personnel, and other employees. Jones who had never previously complained to Fisher about anything regarding the Plaintiff, Jones, in a meeting requested by the Plaintiff and between Fisher, Jones, and the Plaintiff, would express in the meeting that Felder "scared her." This was the first time the Plaintiff and Fisher had heard such an expression, and Jones could not give a singular reason or scenario for the reason behind such a serious expression.

k.  Jones would continue the character assassination on the Plaintiff, eventually calling Felder insolent and combative to Fisher and others, although never giving one incident that would warrant such damaging descriptions/characterizations of Felder.

l.  Jones never gave the Plaintiff any sort of disciplinary action, nor was there anything in the Plaintiff's employment file that would permit such accusations by Jones. Felder, up until and even the past the day she was wrongfully terminated had a perfect employee file with no strikes, negative remarks, poor reviews, or disciplinary actions or concerns noted. In retaliation of Felder reporting/complaining to Fisher about the obscene and disturbing behavior of Jones, Jones deliberately attempted to ruin Felder's squeaky-clean image and reputation though false and defamatory statements.

m.  On September 20, 2017, the day of the SJP Retail event, the Plaintiff had stayed and worked through the night of September 19th to the morning hours of the 20th to ensure everything for the event was perfect and functioning. See Complaint, Exhibit A. As the Plaintiff was finishing up and preparing to leave to go get ready for the Retail Event, she upon leaving the stockroom was met by Jones who never greeted or acknowledged the Plaintiff, and was dismantling and moving all of the displays, furniture, and arrangements in the Boutique. As the Plaintiff attempted to ask Jones what's wrong, the Plaintiff is met with complete silence and a roll of the eyes by Jones. The Plaintiff repeatedly tries to ask Jones what the Plaintiff has done wrong, but Jones ignores her, before yelling at the Plaintiff to "Leave!" Jones then calls MGM National Harbor Security to whom she reports that the Plaintiff is an "irate employee." Plaintiff is then immediately met with not just MGM National Harbor Security, but also, Prince George's Police Department Officers and their large, intimidating dogs. The Plaintiff is so distraught that her knees completely buckle. The Plaintiff immediately runs to the stockroom to call Fisher for urgent help. The Plaintiff, who never got within 5 feet of Jones, never raised her voice, never got upset, but instead was in complete shock, panic and fear for her well-being, could not understand why she was being subjected to such disparate, irrational, and outrageous treatment/conduct from Jones.

n.   The Plaintiff, who had never in her entire life been in a fight, who had never acted out of character, or who had never been in trouble, was being described as an "irate employee", subjecting her to treatment like that of a common criminal, and wrongly and unjustifiably exposed her to scorn and utter shame. Jones malicious use of the word "irate" put the Plaintiff in danger, especially in today's sensitive and antsy nature. If the Plaintiff was "irate" would Security and the Police Officers allowed her to go alone to the stockroom to call Fisher, even allowing her to finish her call? Would the Plaintiff have been allowed to grab her belongings herself? The Plaintiff was actually so calm in demeanor and temperament that the MGM National Harbor Security Guards actually apologized to the Plaintiff for what had transpired, gave her a hug, and even expressed remorse for the cruel and unusual treatment Plaintiff had to endure. If the Plaintiff's behavior was one that could rightly be characterized as "irate," would Fisher have expected Plaintiff to come back and manage the Retail Event? Jones wanted to publicly scorn and humiliate the Plaintiff and publicly ruin her impeccable reputation.

o.   Jones, without the Plaintiff's knowledge, took video of parts of the incident and showed it to fellow employees. The video was not of Felder being escorted out of the building by Security, but rather of when Felder was asking Jones "what's wrong" and Jones ignoring her. A fellow employee who saw the video, called and text-messaged the Plaintiff, and informed her that Jones was showing the video to employers. The employee mentioned that the video showed the Plaintiff "doing nothing wrong." "You were doing nothing wrong," said the employee to the Plaintiff. Jones once again, in a further attempt to defame and slander the Plaintiff, tried to humiliate and disparage the Plaintiff by publicly showing snippets of a video that attempted, but failed to succeed, to cast Plaintiff in a negative light. As the employee said, the video actually showed the Plaintiff "doing nothing wrong," despite the combative and irate picture that Jones was attempting to paint of the Plaintiff. Jones tried desperately to defame and slander the perfect reputation of the Plaintiff by any means necessary, including lying and maliciously reporting a false description to Security.

IX.

## PRELIMINARY ALLEGATIONS

## REGARDING NEGLIGENT RETENTION / SUPERVISION

84. Fisher is the final authority in all discriminatory and nondiscriminatory matters, responsible for the hiring, screening, training, retention, supervision, discipline and counseling of employees under his Division/Department.

85. Fisher was well aware of the problems plaguing the Retail Division before Felder was employed by MGM National Harbor.

86. Fisher regularly described the Retail Division as "a mess."

87. Fisher knew of the Management and employee problems within the Retail Division as several complaints between various employees had been recently launched while Jones was absent.

88. Fisher was also well aware of the multiple disciplinary infractions and complaints that were launched by employees regarding Management and those in Leadership Roles.

89. Fisher was well aware of the high turnover rate and recent employee terminations due to the toxic environment and low employee morale.

90. At or around the same time the Plaintiff was employed, Fisher had implemented regular meetings with Management and those in Leadership roles, creating a sort of open door policy; which is one reason why the Plaintiff initially felt so comfortable to come to Fisher for help with the problems occurring with Jones and Wilburn.

91. Fisher was well aware of the depth and seriousness of Jones errant and egregious behavior towards the Plaintiff because the Plaintiff informed Fisher, warning him that everything "she had built, that she had done for the good of the Company and store, was being completely undone by Jones," and that "everything was being changed without the Plaintiff's consent, without consulting her, without her knowledge. All the authority that Fisher had granted the Plaintiff was being taken away."

92. Fisher knew the magnitude of how horrible the situation was with Jones and Wilburn's behavior towards the Plaintiff, that the Plaintiff requested to Fisher if she could be transferred to another store or department. Fisher denied that request.

23

93. Fisher was further made aware of the ill conduct of Jones when during a meeting requested by the Plaintiff with Fisher, Jones and the Plaintiff in attendance, Fisher asked the Plaintiff what were her thoughts on what she would feel would help move the team in the right direction. Plaintiff replied, *"I feel that it is important that we act as a team, and that we are united in our goals and objectives. Our lines of communication must be open, and I think it is important that we all have the best interest of the business and each other at heart. It's important that we respect and honor roles and responsibilities and support one another in our endeavors. If we respect one another and actively strive to work together, then we can accomplish much and have great success."* From the Plaintiff's response, Fisher should have known that any similar conduct by Jones moving forward was deliberate and that Jones was willfully acting in a way to purposely harm the Plaintiff.

94. Once the Plaintiff immediately reported to Fisher the actions of Jones and the events that transpired on September 20, 2017, Fisher should have immediately acted to protect the Plaintiff, and to at least investigate if Jones was right in her actions, which she was not.

95. Fisher chose not to act, and instead, allowed the Plaintiff to severely suffer at the hands of Jones' despicable and malicious conduct, including humiliation, slander, defamation, endangerment of life, severe emotional distress, and loss of employment.

X.

## PRELIMINARY ALLEGATIONS

## REGARDING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

96. Jones intentionally reported the Plaintiff as an "irate" employee to MGM National Harbor Security.

97. "Irate" is a word that in a social or work setting is not used unless a person or employee is acting in such a way that he/she is uncontrollable, irrational, unreasonable, or in a manner that puts the well-being or life in immediate proximity in absolute danger. This word is often used to describe someone in great rage and/or has an intent to harm, and as such, it is a "trigger" word that Security and Law Enforcement take extremely seriously.

98. When Jones intentionally used this word to falsely and maliciously describe or report the Plaintiff's alleged behavior/demeanor to MGM National Harbor Security, Jones willfully put the Plaintiff's life in danger, and immediately exposed her to extreme and outrageous conduct, robbing her dignity.

99. The Plaintiff, a calm, happy-go-lucky, never in trouble, goody-two-shoes who had never been in a physical altercation, never been sent to the principal's office, who doesn't even have a parking ticket to her name, an outstanding employee, with a solid and perfect reputation, all of a sudden, after staying hours to prepare and perfect arrangements for her first ever SJP Retail Event under what should have been her supervision and management, was being "thanked" by Jones by being called an "irate employee", resulting in the Plaintiff being confronted by MGM National Harbor Security and armed Prince George's County Police officers with huge, frightening dogs, and being escorted out of the building like a common criminal, flanked by Security and Officers, completely denying the Plaintiff's dignity as a person. Felder endured this outrageous conduct all while still being a good standing employee, still employed by MGM National Harbor, who was not fired, and who the right to be at the Boutique, as it was her place of work and employment.

100. The Plaintiff was so scared, so nervous that her knees buckled in distress.

101. The Plaintiff was in such emotional and mental distress that she frantically called Fisher for help and support to rectify the situation.

102. The Plaintiff was so emotionally distressed that she sat in her car in the MGM National Harbor Executive Parking Garage for almost 4 hours long.

103. The Plaintiff was so emotionally distressed that her Mother, extremely worried about her safety, would not allow her to drive home until she could emotionally calm down, which was several hours later.

104. The Plaintiff was so emotionally distressed that she remained in bed for over 24 hours in pure darkness as she wept bitterly at what had transpired.

105. The Plaintiff was so emotionally distressed that several employees called and texted her to let her know how angry, sad, distraught, and disgusted the were over the incident.

106. The Plaintiff suffered such emotional distress in the months that followed that it was suggested to have her dog registered as an emotional support animal.

107. In the months that followed, the Plaintiff had become so distressed by the thoughts and flashbacks of that awful day, that one day, while washing her face, the Plaintiff, while reflecting on the traumatic

events, became so tense that she unknowingly scrubbed her face so hard that she accidentally ripped some of the skin off her face. The scar still visible down to this day.

108. Even up until today, the Plaintiff refuses to visit MGM National Harbor, as just the thought or sight of it gives her such anxiety that she gets headaches and even trembles/shakes.

XI.

## PRELIMINARY ALLEGATIONS REGARDING

## RACE/COLOR/SEX DISCRIMINATION AND WRONGFUL TERMINATION

109. Plaintiff is a thin, tall, fair-skin (light tone) African American female with long black hair.

110. Plaintiff is a model employee with noted and recognized excellent job/work performance with absolutely no negative or bad remarks against her, and without any disciplinary actions against her.

111. Plaintiff was terminated from her job by Jones.

112. Jones is a dark-skinned African American female.

113. The two other Assistant Retail Managers are comprised of a Caucasian female and a dark-skin (darker tone) male.

114. On the day of the Plaintiff being escorted from the building at the command of Jones, John Doe, a friend to Jones, had tried to assume the Plaintiff's roles and duties on the day of the SJP Retail Event, but was immediately corrected, and told to assume his original duties as Sales Lead.

115. Upon the Plaintiff's termination, the Plaintiff's Position remained vacant.

116. Upon the Plaintiff's termination, although her actual Position remained vacant, when necessary, Assistant Retail Manager Diane Lemberg, a Caucasian female, would be asked to assist with the SJP Boutique.

117. Jones should have known or knew of the discriminatory customs, practices, policies, and wrongful acts of the Defendants, and she condoned, ratified, authorized and/or engaged in such conduct.

118. Jones at times relevant to this action has set disciplinary policy, supervised and directed the institution and conduct of investigations (or the lack thereof), and made recommendations as to the penalties regarding disciplinary matters within the Retail Division.

119. Jones has engaged in disproportionate discipline of fair-skin (lighter tone) African Americans within the Retail Division of MGM National Harbor.

26

120. Defendants have engaged in a pattern and practice of discrimination against fair-skin (lighter tone) African Americans by maintaining and allowing a work environment that is hostile on the basis of race, color, and sex, including but not limited to derogatory remarks, disparate treatment in the general work environment and the terms and conditions of employment.

121. MGM National Harbor and its parent company MGM Resorts International Policy Against Discrimination, Harassment and Retaliation states: *"MGM Resorts International is committed to a lawful and harmonious work environment that fosters respect for the humanity and dignity of all persons. MGM Resorts therefore prohibits workplace discrimination, harassment or retaliation based on any classification or condition that is protected by law. This Policy Against Discrimination, Harassment and Retaliation ("Policy") shall apply to each of its domestic and foreign subsidiaries and affiliated companies (referred to collectively in this Policy as the "Company"), and all Company personnel (including hourly, salaried, supervisory, managerial and executive regardless of title or position) shall adhere to the principles of this Policy in compliance with all applicable federal, state and local laws, rules and regulations.*

*Employees shall not subject other employees, company guests, customers, or vendors, or their employees or representatives, to any form of discrimination or harassment based on sex, race, color, national origin, ancestry, age, religion, veteran status disability, perceived disability, sexual orientation, union affiliation, genetic information, gender identity or expression, transgender status or any other status or classification protected by law. All employees are required at all times to exhibit respect, professionalism and reasonable judgement in their communications with and conduct toward all other persons in our workplace.*

*Employees likewise shall not retaliate against another employee or individual based on his/her good faith exercise of the legal right to complain through established methods about discrimination or harassment, or an employee's cooperation in the investigation o fa complaint of discrimination or harassment."* See Complaint, Exhibit G.

Defendants fail to adhere to this requirement.

122. The Retail Division under Jones' supervision had a pattern of discriminatory conduct against fair-skin (lighter tone) African American employees.

123. Fair-skin (lighter tone) African American employees acting in any Supervisory or Leadership capacity, including the Plaintiff, have had their authority undermined by Jones and other dark-skin (darker tone) African American employees.

    a. For example, Plaintiff, and others similar to Plaintiff, attempting to seek help, intervention, or discipline for dark-skin (darker tone) African American employees who committed wrongful acts or who broke Company policies have been repeatedly discouraged from filing any formal disciplinary proceedings, have had their Complaints gone missing or not filed, or have themselves been subject to disciplinary actions. The Plaintiff, and other similar fair-skin (lighter tone) African American employees, have had their management, supervisory, or leadership roles limited and undermined at the sole discretion of Jones and other dark-skin (darker tone) employees in favor of the dark-skin (darker tone) African American employees who report them.

124. Employee discipline in the Retail Division is administered in a grossly discriminatory manner. Fair-skin (light tone) African American employees are subjected to discipline for trivial infractions and alleged infractions, whereas dark-skin (darker tone) African American employees and Caucasian employees are permitted to breach the rules near impunity.

125. Fair-skin (lighter tone) African American employees are terminated at a much higher rate than darker skin African American employees and Caucasian employees. A comparison of the discipline imposed upon Plaintiff and similar employees to the discipline imposed upon dark-skin (darker tone) African Americans and Caucasian employees will show substantial disparity in treatment.

126. Upon information and belief, fair-skin (lighter tone) African Americans within the Retail Division have been, or, are being terminated or subjected to harsher discipline at a statistically significant higher rate than dark-skin (darker tone) African Americans and Caucasian employees.

127. At all relevant times, the majority of the employee staff in the Retail Division were darker skin (darker tone) African American employees. The Plaintiff and only one other employee in the SJP Boutique were fair-skin (lighter tone) African American.

128. The vast majority of the make-up of MGM National Harbor's employees in Leadership/Executive Level positions, were Caucasian.

129. The vast majority of the make-up of MGM National Harbor's employees outside of Leadership/Executive Level positions were African Americans.

130. Under information and belief, the original SJP Boutique team included a Caucasian Retail/Store Manager; three fair-skin (lighter tone) African American employees; and two dark-skin (darker tone) African American employees. Two out of three of the fair-skin employees were fired for trivial matters unrelated to work performance or disciplinary actions. The third fair-skin employee, while not fired, was promoted to Brand Ambassador by Wilburn, only to have Jones and the two other dark skin employees object; and without reason or due cause, the fair-skin employee lost her perk and employment opportunity as Brand Ambassador without any explanation to her. The other two dark-skin employees were never disciplined despite having infractions and complaints for excessive tardiness, absences, or stealing Clients from the fair-skin employee. Even when the fair-skin employee filed a Complaint with Jones about the incidents in store, upon following up, the fair-skin employee found out that the HR department had no recollection or record of her Complaint.

131. Plaintiff was terminated and escorted out of the building by security, police officers and dogs for no known or logical reason. But a dark-skin (darker tone) male who was terminated for stealing money bags from the register, was escorted out with a single plain-clothes MGM National Harbor Security guard, no police, no dogs.

132. Plaintiff was terminated for no just cause. But two dark-skin (darker tone) employees got into a serious physical altercation on Company grounds that required Security and police to break up. These darker-skin (darker tone) employees were allowed to return to work the following week, with no known serious disciplinary actions.

### XII.

### <u>PRELIMINARY ALLEGATIONS REGARDING TITLE VII</u>

133. It is informed and believed, that MGM Harbor is required to hire a certain number of employees from Prince George's County, Maryland.

134. It is informed and believed, Prince George's County's population is predominately African American/Black.

135. It is informed and believed, MGM Harbor's employees are predominately African American/Black.

136. It is informed and believed, most of MGM Harbor's executive and higher-level managerial positions are non-Black or White.

137. It is informed and believed, in the Retail Department, the vast majority of the staff is Black, having predominately the same skin color/tone, which is medium to darker shades of brown.

138. It is informed and believed, the retail department lacked diversity.

139. It is informed and believed, the SJP brand is created, designed, and marketed by a White/Caucasian woman.

140. It is informed and believed, the majority of SJP's clients are White/Caucasian women.

141. It is informed and believed, that while MGM Harbor hired an all or majority Black/African American salesmen and saleswomen staff, the first manager who was the same manager prior to Plaintiff's employment, was a mature White/Caucasian woman.

142. It is informed and believed, Jones is an African American female with darker skin tone.

143. It is informed and believed, that before MGM Harbor opened, MGM Corporate hired majority of the staff.   . During this time there were Black/African American employees with lighter skin tones hired.

144. It is informed and believed, that the employees Jones hired were Black/African American with darker skin tones, male and female.

145. It is informed and believed, SJP Corporate was looking for a new manager to solely manage SJP Boutique.

146. It is informed and believed, the prospective candidate and front-runner was a White/Caucasian female. It is informed and believed, that the only reason this candidate was not hired, was that she fraudulently pretended to be the Assistant to Sarah Jessica Parker.

147. It is informed and believed, thereafter, Plaintiff was sought-out and discovered by Wilburn of SJP Corporate to be the Store Manager of the SJP Boutique particularly due to the Plaintiff, although African American, having very fair skin, and is young, tall, and thin, with long hair.

148. Plaintiff was on numerous occasions told by employees and managers, including Jane and John Doe that she is a "younger, taller, thinner, light-skinned, pretty version of Jones."

149. Plaintiff was also told several times by employees, including an Assistant Manager of Retail that "[she] looks like [she] belongs in SJP, and that the store needs more people like [Plaintiff] that fits the SJP brand."

150. Plaintiff was often looked up and down, from head-to-toe by Jones.

151. Jones would refer to Plaintiff as "Queen."

152. Plaintiff several times personally asked Jones, "Where is the diversity here?"

153. Plaintiff constantly mentioned to Jones and both Assistant Managers of Retail that she would like, and feels it is important, to hire people of various backgrounds and ethnicities.

154. Plaintiff was not allowed by Jones to have the freedom of duties and responsibilities that the other Assistant Retail Managers were privy to. It is important to note that one of the Assistant Retail Managers was a White/Caucasian female, while the other was a dark skin African American male.

155. Although Plaintiff was extremely experienced, knowledgeable, and fully capable, with a proven track record, and not one bad or negative mark or disciplinary action, Jones would take away Plaintiff's responsibilities, duties, rights, and freedoms entitled to her as a Manager and give those duties to those whose positions were extremely less-qualified and experienced and had negative reviews and complaints, as well as disciplinary actions against them.

156. Jones would also take, favor, and implement the thoughts, suggestions and/or preferences of others not privy to such final decisions over the thoughts, suggestions and/or preferences of Plaintiff, who is the Store Manager.

**XIII.**

**<u>CLAIMS</u>**

**COUNT I**

**TORTIOUS MISREPRESENTATION / FRAUD**

157. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 157 herein as if fully set forth.

158. Defendants violated Md. Commercial Law Code Ann. §1-304.

159. Defendants violated Md. Commercial Law Code Ann. §8-501(1).

160. In doing the acts alleged herein, Defendants suppressed and concealed certain material facts which they had a duty to disclose to the Plaintiff.

161. In particular, Defendants knew and concealed from Plaintiff the material fact that the Plaintiff had to complete a 90-Day Probationary Period.

31

162. Defendants had a duty to disclose and explain this material fact as a result of their fiduciary relationship to Plaintiff. In addition, Defendants had an independent duty to disclose this material fact since they undertook to make other affirmative representations about these matters and were thus bound to make full and fair disclosure of all material facts.

163. Defendants suppressed or concealed material facts with intent to induce reliance and to defraud Plaintiff.

164. At all relevant times, Plaintiff was unaware of the material facts that were suppressed and concealed by Defendants. If Plaintiff had been aware, she would have taken steps to protect herself, including, but not limited to refusing the job offer and continuing and accepting the promotion from SMU.

165. As a proximate result of Defendants intentional and fraudulent suppression and concealment of the aforementioned material facts, Plaintiff has suffered, and continues to suffer damages, in an amount currently unascertained, but according to proof of trial.

166. The aforementioned conduct of Defendants constitutes fraud, suppression and/or concealment of material facts known to them, with the intent on the part of the Defendants of inducing reliance and thereby depriving Plaintiff of financial and job security, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of the Plaintiff's rights, and as such justifies an award of exemplary and punitive damages.

## COUNT II

## BREACH OF CONTRACT

167. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 167 herein as if fully set forth.

168. The Plaintiff's contractual position was Assistant Manager of Retail, and is a binding, legal instrument that creates mandatory obligations, attached hereto as **Exhibit E** and incorporated herein, on the part of MGM and the Plaintiff.

169. Defendants violated Md. Commercial Law Code Ann. §2-206.

170. Defendants violated Md. Commercial Law Code Ann. §22-701.

171. Defendants violated Md. Commercial Law Code Ann. §1-304.

172. Defendants breached their contractual obligations to Plaintiff by failing to allow her to complete and successfully execute duties and obligations she was privy and well-qualified to do, and the critical terms for

32

which the Plaintiff accepted the job offer, including that which to "Manage, communicate, and execute retail events," as required by the Position's Responsibilities/Duties.

173. Defendants willfully and without just cause mitigated and reduced Plaintiff's duties to those of a Sales Operations Lead Associate.

174. Plaintiff has performed all obligations and satisfied all responsibilities arising on her behalf, pursuant to the written Agreement, accept those waived or excused as a result of Defendant's breach of Contract and misconduct.

175. As a proximate result of Defendant's breach of the Agreement, Plaintiff seeks compensatory and punitive damages, in an amount to be proved at trial.

## COUNT III

## SLANDER

176. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 176 herein as if fully set forth.

177. In September of 2017, Jones made the following defamatory statements to management, employees, and executives of MGM:

    a.   Jones falsely stated to Mr. Lenard Knight, an Assistant Manager of Retail, that Plaintiff was "going at it" with Wilburn.

    b.   Jones stated to Fisher that Plaintiff "scared her".

    c.   Jones told several employees of MGM Harbor and Fisher that Plaintiff was "combative and insolent".

    d.   Wilburn falsely stated to Jones and two other MGM Harbor employees that Plaintiff is a "dictator".

    e.   Jones reports Plaintiff to security and MGM Harbor employees as an "irate employee".

    f.   Jones video records Plaintiff during her most humiliating interaction with Jones and shows the video to numerous SJP Boutique and MGM Harbor employees.

178. The statements made by Defendants, and each of them, had the tendency to injure Plaintiff in her occupation because the statements attack Plaintiff's veracity as a kind, understanding, mild-tempered, peaceful, professional, highly-esteemed Manager and employee of MGM Harbor.

179. Upon information and belief, employees of MGM Harbor understood that the statements were about Plaintiff as the statements were made of, concerning, and mentioned Plaintiff expressly.

180. All statements are entirely false as they pertain to Plaintiff, and are defamatory, slanderous, slanderous on their face, and exposed Plaintiff to danger, ridicule, and obloquy, and can negatively affect others outlook and perception of the Plaintiff because Plaintiff was never, at any time, a disputatious, violent, or combative person, employee, or Manager. These statements were understood by those who heard them in a way that defamed the good and positive reputation of Plaintiff as an honorable, well-liked, peaceable, peace-making, well-respected professional, and that the statements connote Plaintiff to exhibit a violent disposition towards those in authority and other MGM Harbor employees.

181. These statements were made to various employees, partners, executives, and management to and of MGM Harbor in Prince George's County, Maryland.

182. Upon information and belief, Defendants, and each of them, failed to use reasonable care to determine the truth or falsity of the statements. Upon information and belief, the wrongful conduct of Defendants, each of them, was a substantial factor in causing Plaintiff harm, including but not limited to, harm to Plaintiff's profession, and/or occupation, endangerment to her life and well-being, harm to Plaintiff's reputation, in addition to that assumed by law.

183. As a proximate result of the above-described Statements, Plaintiff has suffered loss to her reputation, shame, embarrassment, mortification, severe emotional distress, and hurt feelings, all to her general damages.

184. Upon information and belief, by engaging in the above conduct, Defendants, and each of them, acted with wrongful intention of injury to the Plaintiff, malice, oppression, and/or fraud, from an improper and evil motive amounting to despicable conduct, and in conscious disregard of Plaintiff's rights, entitling Plaintiff to exemplary and punitive damages.

## COUNT IV

## DEFAMATION

185. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 185 herein as if fully set forth.

186. In September of 2017, Jones made the following defamatory statements to management, employees, and executives of MGM:

    a.   Jones falsely stated to Mr. Lenard Knight, an Assistant Manager of Retail, that Plaintiff was "going at it" with Wilburn.

    b.   Jones stated to Fisher that Plaintiff "scared her".

    c.   Jones told several employees of MGM Harbor and Fisher that Plaintiff was "combative and insolent".

    d.   Wilburn falsely stated to Jones and two other MGM Harbor employees that Plaintiff is a "dictator".

    e.   Jones reports Plaintiff to security and MGM Harbor employees as an "irate employee".

    f.   Jones video records Plaintiff during her most humiliating interaction with Jones and shows the video to numerous SJP Boutique and MGM Harbor employees.

187. The statements made by Defendants, and each of them, had the tendency to injure Plaintiff in her occupation because the statements attack Plaintiff's veracity as a kind, understanding, mild-tempered, peaceful, professional, highly-esteemed Manager and employee of MGM Harbor.

188. Upon information and belief, employees of MGM Harbor understood that the statements were about the Plaintiff as the statements were made of, concerning, and mentioned Plaintiff expressly.

189. All statements are entirely false as they pertain to Plaintiff, and are defamatory, slanderous, slanderous on their face, and exposed Plaintiff to danger, ridicule, and obloquy, and can negatively affect others outlook and perception of the Plaintiff because Plaintiff was never, at any time, a disputatious, violent, or combative person, employee, or Manager. These statements were understood by those who heard them in a way that defamed the good and positive reputation of Plaintiff as an honorable, well-liked, peaceable, peace-making, well-respected professional, and that the statements connote Plaintiff to exhibit a violent disposition towards those in authority and other MGM Harbor employees.

190. These statements were made to various employees, partners, executives, and management to and of MGM Harbor in Prince George's County, Maryland.

191. Upon information and belief, Defendants, and each of them, failed to use reasonable care to determine the truth or falsity of the statements. Upon information and belief, the wrongful conduct of Defendants, each of

them, was a substantial factor in causing Plaintiff harm, including but not limited to, harm to Plaintiff's profession, and/or occupation, endangerment to her life and well-being, harm to Plaintiff's reputation, in addition to that assumed by law.

192. As a proximate result of the above-described statements, Plaintiff has suffered loss to her reputation, shame, embarrassment, mortification, severe emotional distress, and hurt feelings, all to her general damages.

193. Upon information and belief, by engaging in the above conduct, Defendants, and each of them, acted with wrongful intention of injury to the Plaintiff, malice, oppression, and/or fraud, from an improper and evil motive amounting to despicable conduct, and in conscious disregard of Plaintiff's rights, entitling Plaintiff to exemplary and punitive damages.

194. Upon information and belief, in engaging in the above conduct, Defendants and DOES 1 through 50 inclusive, and each of them, acted with malice, oppression, and/or fraud entitling Plaintiff to exemplary and punitive damages.

## COUNT V

## NEGLIGENT RETENTION/SUPERVISION

195. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 195 herein as if fully set forth.

196. At all times, Jones was under the direction, supervision, and control of Fisher.

197. Upon information and belief, Fisher was well aware that Jones had treated Plaintiff unfairly, harshly, with malice, and cruel intent as was evident in the prior two meetings Fisher had with Jones regarding her behavior, treatment, and conduct towards Plaintiff.

198. Fisher failed, neglected and/or refused to supervise or to properly discipline Jones knowing that her wrongful actions had been relentless and unwarranted towards the Plaintiff.

199. Upon being notified by the Plaintiff that Jones had falsely labeled and reported her as irate to security and the Plaintiff was confronted with dogs and armed policemen and security, Fisher failed to act and take any appropriate actions or discipline against Jones or to investigate the incident further.

200. The acts of Jones were foreseeable.

201. Pursuant to Common Law and Maryland Civil Code, Defendants, and each of them, were and remain responsible for the damage and injury as a result of their lack of ordinary care in the management of their persons. By engaging in the acts herein alleged, Defendants negligently breached said duties owed to Plaintiff.

202. The unlawful and vicious conduct alleged above was engaged in by supervisors and/or managing agents of Defendants who were acting at all times relevant to this Complaint within the scope and course of their employment. Defendants are, therefore, strictly liable for the conduct of said agents and employees.

203. Defendants' negligence has and continues to be a substantial factor in causing injury and damages to the Plaintiff.

204. As a direct and proximate result of the acts and conduct of Jones, Plaintiff suffered and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety, and is therefore entitled to receive special damages, and/or general damages in amounts to be determined at trial.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

205. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 205 herein as if fully set forth.

206. Defendants' conduct as alleged in the preliminary allegations was outrageous and extreme in that it went beyond all bounds of decency and was atrocious and utterly intolerable in a civilized society.

207. Defendants engaged in this conduct with the specific intent to cause Plaintiff severe and extreme emotional distress and/or with reckless disregard of the probability of doing so. Defendants knew or should have known that their conduct will cause extreme vexation, injury, distress, and damage to the emotional and psychological health, safety, and well-being of Plaintiff.

208. The conduct of the Defendants as alleged in this Complaint was sufficiently pervasive to alter the terms and conditions of employment and the work environment such that it created a hostile environment, hostile to the Plaintiff and other employees.

209. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of financial stability, peace of mind and future security.

37

210. As a direct, proximate, and legal result of the extreme and outrageous conduct of the Defendants, Plaintiff sustained mental pain and suffering in a sum to be determined at trial.

211. The aforementioned conduct was malicious, despicable, and carried out with willful and conscious disregard to the rights and safety of Plaintiff, thereby entitling Plaintiff to punitive damages to punish and make an example of Defendants.

## COUNT VII

## RACE DISCRIMINATION

212. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 212 herein as if fully set forth.

213. At all times herein mentioned, Title VII of the Civil Rights Act of 1964 Government Code 42 U.S.C. § 2000-e2(a), was in effect and binding on Defendants. These statutes require Defendants to refrain from Discriminating against any employee based on race.

214. At all times herein mentioned, State Government Article, § 20-602, Annotated Code of Maryland, was in effect and binding on Defendants. This statute protects Maryland employees from discrimination based on race.

215. Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Defendants based on her race. These employment actions were unlawful.

216. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of Plaintiff's violation of her civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981, including actual damages, compensatory damages, punitive damages.

## COUNT VIII

## COLOR DISCRIMINATION

217. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 217 herein as if fully set forth.

218. At all times herein mentioned, Title VII of the Civil Rights Act of 1964 Government Code 42 U.S.C. § 2000-e2(a), was in effect and binding on Defendants. These statutes require Defendants to refrain from Discriminating against any employee on the basis of color.

219. At all times herein mentioned, State Government Article, § 20-602, Annotated Code of Maryland, was in effect and binding on Defendants. This statute protects Maryland employees from discrimination on the basis of color.

220. Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Defendants on the basis of her color. These employment actions were unlawful.

221. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of Plaintiff's violation of her civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981, including actual damages, compensatory damages, punitive damages.

## COUNT IX

## SEX DISCRIMINATION

222. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 222 herein as if fully set forth.

223. At all times herein mentioned, Title VII of the Civil Rights Act of 1964 Government Code 42 U.S.C. § 2000-e2(a), was in effect and binding on Defendants. These statutes require Defendants to refrain from Discriminating against any employee based on sex.

224. At all times herein mentioned, State Government Article, § 20-602, Annotated Code of Maryland, was in effect and binding on Defendants. This statute protects Maryland employees from discrimination based on sex.

225. Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Defendants based on her sex. These employment actions were unlawful.

226. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of Plaintiff's violation of her civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981, including actual damages, compensatory damages, punitive damages.

## COUNT X

## WRONGFUL TERMINATION

227. Plaintiff incorporates by reference and repeats and repleads paragraphs 1 through 227 herein as if fully set forth.

228. At all times herein mentioned, Title VII of the Civil Rights Act of 1964 Government Code 42 U.S.C. § 2000-e2(a), was in effect and binding on Defendants. These statutes require Defendants to refrain from discriminating against any employee on the basis of color, sex, and/or race.

229. Plaintiff was terminated because of her color, sex, and race. Plaintiff was terminated because of personal insecurities and biases of Defendants. Defendants were demonstrably biased against Plaintiff's color, sex and race by using derogatory language and titles to describe and reference Plaintiff to others and refusing to allow Plaintiff to the same working rights and duties of others.

230. Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Defendants on the basis of her color, sex, and race. These employment actions were unlawful.

231. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of Plaintiff's violation of her civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981, including actual damages, compensatory damages, punitive damages.

## XIV.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a jury trial on all issues and claims triable by jury.

XV.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays for relief against MGM National Harbor, LLC as follows:

(1)  General and compensatory damages, including prejudgment interest, according to proof;

(2)  Nominal damages;

(3)  Special damages according to proof, including, without limitation, loss salary, both front and back pay, and any other benefits to which Plaintiff would have been entitled to by reason of her employment with Defendants, according to proof;

(4)  Equitable relief in the form of back pay;

(5)  Punitive and exemplary damages; and

(6)  Such other and further relief as the Court may deem just and proper.

DATED: September 13, 2019                                     BRITTNEY FELDER

By: _____

BRITTNEY FELDER,

Plaintiff,

Pro se