## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRITTNEY FELDER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. PJM-18-3405 |
| | * | |
| MGM NATIONAL HARBOR, LLC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM OPINION

Pending before the Court[1] is "Plaintiff's Motion for Sanctions," and a memorandum in support thereto (collectively "the Motion") filed by Plaintiff Brittney Felder ("Plaintiff"). (ECF Nos. 90, 90-1). Defendant MGM National Harbor, LLC ("Defendant") has filed a response in opposition ("Opposition"), and Plaintiff has filed a Reply. (ECF Nos. 93, 94, 94-1).[2] The matter has been fully briefed, and upon review of the parties' submissions, no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth herein, the Motion is granted in part, denied in part.

---

[1] The Honorable Peter J. Messitte referred this case to me for discovery and all related scheduling. (ECF No. 62).

[2] Plaintiff has also filed an "*Ex Parte* Motion to Permit the Filing of a Memorandum in Excess of Fifteen Pages" and a memorandum in support thereto. (ECF Nos. 95, 95-1). In brief, Plaintiff sought leave to file a memorandum related to her Reply that exceeds the fifteen-page limit provided for in Local Rule 105.3 (D. Md. 2023). Plaintiff contended that she "needs to [address the] untrue allegations and arguments that the Defendant raised" in its Opposition. (ECF No. 95). The undersigned is unclear why the request was filed *ex parte,* and Plaintiff cites to no rule or caselaw to support making an *ex parte* request. In addition, the record does not reflect that Plaintiff sought the Defendant's consent to exceed the page limitation. Regardless, the undersigned reviewed the memorandum, which is just under seventeen full pages in length. (*See* ECF No. 94-1). Moreover, the docket sheet does not reflect that Defendant has objected to Plaintiff's request and there is no information before the undersigned that the Defendant has been prejudiced by Plaintiff's filing. Accordingly, the Court grants the motion to exceed the page limitation. A separate order follows.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Presently pending before the Court is Plaintiff's claim against the Defendant alleging employment discrimination, in violation of Title VII of the Civil Rights Act of 1964.  In brief, in or about the Summer of 2017, Defendant hired Plaintiff as an Asst. Retail Manager to work at one of its retail stores, the SJP (Sarah Jessica Parker) Boutique.  Plaintiff alleges that, during her employment, the Defendant and its employees discriminated against her, and ultimately terminated her, because of her skin color.  (ECF No. 22).

An initial scheduling order was entered in this case, setting December 30, 2022 as the deadline for the close of discovery.  (ECF No. 37).  Subsequently, after Plaintiff filed a motion to compel responses to interrogatories on December 6, 2022, the Defendant moved for extension of the deadline for the close of discovery.  (ECF Nos. 43, 44).  In December 2022 and January 2023, the parties made additional filings related to the motion for extension of time and the first and second motions to compel filed by Plaintiff.  (ECF Nos. 45-47, 49, 51, 52, 56-58, 61).[3]  Ultimately, the district court granted the Defendant's request, and held that discovery was set to close on February 28, 2023.  (ECF Nos. 53, 54).

Subsequently, the matter was referred to the undesigned for discovery and all related scheduling.  (ECF No. 62).  Both parties timely filed status reports on the day that discovery was to close, which was February 28, 2023.  (ECF Nos. 70, 71).  In Plaintiff's report, she represented that she received supplemental responses from the Defendant to her interrogatory and document production requests on the last day that discovery was then scheduled to close.  (ECF No. 71).

On March 2, 2023, the undersigned presided over a discovery dispute hearing related to Plaintiff's motions to compel interrogatory requests and requests for production of documents, and

---

[3] Plaintiff also filed a motion to compel production of documents and a supplement related thereto. (ECF Nos. 51, 57).

related to a motion for a protective order filed by the Defendant.  (ECF No. 72).  During the hearing, the undersigned made several factual findings, including: (1) that parties mutually had engaged in an insufficient meet and confer session in an attempt to resolve Plaintiff's outstanding discovery requests; (2) the undersigned was concerned that: (a) many of the 117 document requests propounded by Plaintiff were not truly relevant to the sole claim remaining in this case, nor were they really proportional to the needs of the case, and (b) many of Defendant's objections to the interrogatories were boilerplate; (3) because the undersigned found problematic the tone and tenor of *both* parties' discovery dispute filings—and to get *both* sides back on track so that discovery could end—they would be required to file attestation forms certifying familiarity with and an agreement to abide by the Federal Rules of Civil Procedure, including Rule 26(b)(1), and the Local Rules of the District of Maryland (D. Md. 2023); (4) both sides would be required to attend a meet and confer session, with a court reporter present to generate a transcript, and *both* sides would need to make good faith efforts resolve the outstanding discovery issues; (5) during that meet and confer session, Plaintiff would have to demonstrate a sufficient factual predicate for her requests and the relevance and proportionality of those discovery requests, and the Defendant would be given the opportunity to object to the requests, but those objections could not be boilerplate.  (ECF No. 72).[4] Next, the undersigned specifically directed the parties to identify a timetable for completion of all discovery, including taking any depositions. (*Id.*). Regarding depositions, the undersigned cautioned Plaintiff that if she wanted to take any depositions, she was to communicate with the Defendant's counsel about the same.  (*Id.*).

Ultimately, then, the undersigned: granted in part, denied in part Plaintiff's motions; the Defendant's protective order request was granted; and a deadline for submitting the attestation

---

[4] The undersigned has reviewed the audio recording of this hearing.

forms was provided.  (ECF Nos. 72, 74, 75).  Finally, the undersigned set April 21, 2023 as the deadline for the parties to submit a Joint Status Report (JSR), in which they were to describe:  their efforts to resolve their outstanding discovery disputes; any issues that remained unresolved; and the schedule for completion of discovery.  (ECF No. 75).

Subsequently, the parties timely filed attestation forms.  (ECF Nos. 76, 77).  The parties also timely filed the JSR, and explained that they: (a)  had met and conferred for about 11 hours; (b) had discussed all of Plaintiffs interrogatory and document production requests, and that Plaintiff had represented that some of the discovery requests were no longer in dispute; and (c) had resolved all discovery disputes.  (ECF No. 78, ¶¶ 2, 5, 6).  The parties also *jointly* requested a 60-day extension of the Scheduling Order, during which time they would complete all fact discovery.  In addition, counsel for the Defendant: (a) agreed to "go back to [the Defendant] and conduct additional searches for documents pursuant to the Parties' agreement as to each interrogatory and request discussed during the parties [meet and confer];" and (b) agreed to "supplement Defendant's production with responsive, non-privileged documents pursuant to the Parties' agreement on each specific request."  (*Id.*, ¶¶ 7-9 ).  The undersigned granted the parties' joint request to extend the Scheduling Order, with discovery set to close on June 23, 2023.  (ECF No. 79).

On June 23, 2023, the day that discovery was to close, the parties filed another JSR.  In the JSR, the Defendant represented that it had supplemented Plaintiff's discovery requests with more than 900 pages of additional documents, and that Defendant was still searching for documents and answers responsive to certain discovery requests.  (ECF No. 80, ¶¶ 1, 2).  The issue of a further extension of the close of discovery was set forth: Defendant initially sought an additional 30 days; Plaintiff agreed to a 7-day extension.  Ultimately, the parties agreed to a 7-day extension during

which time Defendant "[would] supplement its responses and production to the remaining discovery requests requiring supplementation, and the Parties would otherwise complete fact discovery." (*Id.*, ¶¶ 4, 6). The parties also agreed that after June 30, 2023, Plaintiff would have a "14-day opportunity to review all further information, documents, and recording supplemented by Defendant by the [June 30] deadline." (*Id.*, ¶¶ 4, 7). Finally, by no later than July 14, the parties would file another JSR. (*Id.*, ¶ 7).

The parties timely filed their next JSR and attachments related thereto. (ECF Nos. 82 through 82-2). In that JSR, which was filed after discovery had supposedly closed[5] the parties brought certain specific discovery issues to the Court's attention. In essence, Plaintiff's position was:

> To date, the Defendant has significantly supplemented their answers and responses to Plaintiff's Interrogatories and Production of Documents Requests, for which Plaintiff is grateful. However, there are still very pressing deficiencies that the Plaintiff has repeatedly brought to the attention of the Defendants.

(ECF No. 82, ¶ 10). According to Plaintiff, the key deficiencies related to: (a) employee profiles "of ALL the SJP Boutique employees under the leadership of Lisa Jones;" (b) emails "from central witnesses," including an email "from a key MGM Corporate employee that shows commendation given to Plaintiff just days before her termination;" and (c) "video and surveillance footage of the week and days leading up to and including the Plaintiff's termination and the surrounding events that transpired." (*Id.*, ¶ 11). In contrast, the Defendant's position was: (a) that it had "worked collaboratively" with Plaintiff to limit the scope of Plaintiff's "overly broad discovery requests," and that, ultimately, it had provided "133 response and supplemental responses to Plaintiff's document request, and 37 answers to Plaintiff's requests for interrogatories;" (b) that it had

---

[5] Below in Section III, the undersigned addresses those paragraphs in the JSR that are relevant to the Motion.

reasonably searched for and produced all responsive emails per the email addressed and terms agreed to by the parties; (c) that it had provided the employee profiles, per the parties agreement, but "would be agreeable to conducting another search for employee profiles Plaintiff believes are missing;" and (d) it had "conducted reasonable searches and do not have responsive video or audio recordings in its position, custody, or control." (*Id.*, ¶¶ 14-16). The Defendant further represented that it had met its discovery obligations related to the personnel profiles and email communications relevant to Plaintiff's sole pending claim. However, it would be willing to supplement its production on both, despite the fact that production of the emails "would be burdensome, expensive, and irrelevant to Plaintiff's sole remaining claim." (*Id.*, ¶¶ 18, 19). Ultimately, the parties jointly proposed " a seven-day extension for Defendant to supplement its production with additional personnel profiles, emails, and video recordings/surveillance under which the Court shall so order(sic)." (*Id.*, ¶ 21). Thereafter, the undersigned construed their requests simply as a joint motion to extend the close of discovery and granted it, identifying July 21, 2023 as the deadline. (ECF No. 83).[6]

On September 1, 2023, roughly 42 days after the close of discovery, the parties filed another JSR, which the Court had not required. In that JSR, the parties represented that Defendant timely provided its final supplemental production per the final scheduling order deadline, and that discovery was closed. (ECF No. 84). Despite discovery being closed, the parties also requested a "telephonic status conference in order to address any outstanding discovery issues and ADR/mediation referral." (*Id.*).

On October 3, 2023, the undersigned presided over a post-discovery telephonic status conference. (ECF No. 86). During that conference, Plaintiff repeatedly articulated in general,

---

[6] The parties also requested a referral for mediation, which the district court later made. (ECF Nos. 82, 88, 89).

non-specific terms that she believed that "many falsehoods" and "gamesmanship" had been committed by the Defendant during the discovery process. (*Id.*). After repeated inquiry by the Court into Plaintiff's allegations, ultimately Plaintiff did articulate that she was not interested in re-opening discovery based on the so-called bad conduct; rather, she was interested in filing a motion for sanctions. Because the Court has a duty to preserve the integrity of the judicial process and to potentially consequence a party who exhibits bad faith in the process, Plaintiff was granted leave to file a motion for sanctions, so that she could clearly articulate and demonstrate the need for sanctions. (ECF No. 87).[7]

## II.   DISCUSSION

Plaintiff advances four grounds in support of her motion that sanctions must be imposed against the Defendant. First, Defendant allegedly spoliated evidence by "recording over [critical] video footage that it had a duty to preserve." Second, Defendant "h[as] refused to turn over" video footage of an interaction involving Plaintiff, her former manager (Lisa Jones) and security personnel and have provided a questionable declaration to support its theory that such footage no longer exists. Third, Defendant has willfully and intentionally failed to admit factual matters in the 29 Requests for Admission that she served upon it, as required by Fed. R. Civ. P. 36. Fourth, Defendant failed to comply with "Discovery Orders" and engaged in "abusive litigation practices, including improper deposition conduct." According to Plaintiff, this relates to the deposition of Lisa Jones, the declaration of Whitney Wilburn, contacting Marcus Taylor, and receiving a copy of the transcript from the parties' April 10, 2023 meet and confer session. (Motion, ECF No. 90-1, pp. 22, 25, 28-30).

---

[7] The parties were also directed to file a motion requesting a referral for mediation. (ECF No. 87).

### A. Spoliation

Plaintiff first contends that the Court must impose spoliation sanctions against the Defendant because it intentionally "recorded over" critical video footage from on or about September 20, 2017 and September 21, 2017[8] in violation of its own internal policy that requires the preservation of such evidence. (Motion, pp. 22, 23). Relatedly, Plaintiff argues that she notified the Defendant that she intended to file a lawsuit, and that because of that notice the Defendant should have reasonably anticipated litigation and preserved the video footage. (*Id.*). Alternatively, Plaintiff avers that her filing of an EEOC charge provided the Defendant with sufficient notice of her anticipated litigation, which should have triggered in its mind the duty to preserve the video footage. (*Id.*).

In this Circuit, spoliation has been defined as "the destruction or material alteration of evidence or the failure to preserve property" that a party could use as evidence "in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)(internal citations omitted); *see also Boone v. Everett.*, 751 F. App'x 400, 401 (4th Cir. 2019)(per curiam).

As is relevant here, a court derives its power to impose sanctions upon a party who spoliates evidence from two sources. First, because Plaintiff alleges that Defendant failed to preserve electronically-stored video footage that she requested, the power to sanction comes from Fed. R. Civ. P. 37(e).[9] Second, a court has "inherent power to control the judicial process and litigation,"

---

[8] As explained more fully below, according to Plaintiff, on or about September 20, 2017 security forcibly removed her from the premises, after her former manager, Lisa Jones, reported her to security. Plaintiff believes that video footage would depict the events of that day.

[9] Fed. R. Civ. P. 37(e) applies to a failure to preserve electronically stored information (ESI). It provides a court with a variety of options/sanctions, "if [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." For instance, a court: "(1) upon finding prejudice to another party from the loss of the information may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in litigation" may the court take other steps,

which a court can use to "redress conduct [that] abuses the judicial process." *Victor Stanley, Inc.*

*v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010)(internal citation and quotation marks

omitted), *aff'd in part, modified in part on other grounds*, Civ. No. MJG-06-2662, 2010 WL

11747756 (D. Md. Nov. 1, 2010).

A movant who contends that spoliation has occurred and seeks a sanction must demonstrate

that:

> (1) the party having control over the evidence had an obligation to
> preserve it when it was destroyed or altered; (2) the destruction or
> loss was accompanied by a culpable state of mind; and (3) the
> evidence that was destroyed or altered was relevant to the claims or
> defenses of the party that sought the discovery, to the extent that a
> reasonable factfinder could conclude that the lost evidence would
> have supported the claims or defenses of the party that sought it.

*Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F.Supp. 2d 673, 678 (D. Md.

2012)(internal citations and quotation marks omitted); *see also QueTel Corp. v. Abbas*, 819 Fed.

App'x 154, 156 (4th Cir. 2020)(citing *Turner v. United States*, 736 F.3d 274, 282 (4th Cir.

2013)(party may be sanctioned if duty to preserve material evidence existed, and the party willfully

engaged in conduct that resulted in destruction of evidence when the party knew or should have

known that the destroyed evidence was or could be relevant in litigation)).

When analyzing Rule 37(e)'s language, a court examines elements that are virtually

identical to those set forth in *Charter Oak*: that "(1) ESI should have been preserved; (2) ESI was

lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4)

the ESI cannot be restored or replaced through additional discovery." *Jennings v. Frostburg State*

---

including presuming that the lost information  was unfavorable to the party or instruct the jury that it may or must
presume that the information was unfavorable to the party."  Fed. R. Civ. P. 37(e)(1), (e)(2)(A), (e)(2)(B).  These
factors are substantially similar to the *Charter Oaks* factors.

*Univ.*, 679 F.Supp.3d 240, 265 (D. Md. 2023)(quoting *Steves & Sons v. JELD-WEN, Inc.*, 327 F.R.D. 96, 103-04 (E.D. Va. 2018)).

In sum, the law is clear that Plaintiff, as the party moving for spoliation sanctions, has the burden to put evidence before the Court and to demonstrate that all of the elements are met under *Charter Oak* and Rule 37.

Immediately below, the undersigned first summarizes the facts put before the Court.

1. *Facts Before the Court*

Plaintiff propounded a request for production of documents upon Defendant in which she sought video footage from the Defendant.[10]  Initially, the Defendant objected on multiple grounds, including vagueness and overbreadth.  (ECF No. 93-1, p. 25[11]).  However, the Defendant also responded that it would "conduct a reasonable search of any responsive [video footage] that reasonably reflect[s] the events at the SJP Boutique at or around September 20, 2017 and September 21, 2017 (*Id.*).  In its supplemental response to RFPD 8, Defendant responded that it searched for-but did not locate-information responsive to the request. (*Id.*, p. 26).  Later, during the parties April 10, 2023 meet and confer session, Defendant explained to Plaintiff:

> We have gone back and asked our client about security footage, and there is none. So I'm happy in terms of the supplement, if you would still like a supplemental response, because that's what we indicate here in the response, that there are no responsive documents. Meaning that there is no security footage for the incident that occurred on September 20th or 21st because—well, because MGM National Harbor has a policy with regard to its security footage, it's regularly recycled. Meaning that documents are only retained for a short number of days before they are recorded over. It's just what they do as a matter of course. They have a policy or procedure about

---

[10] As is relevant to this issue, Request for Production of Documents(RFPD) No. 8 asks for all videotapes "concerning the subject matter of this action, the Plaintiff, Defendant and its affiliates, employees, and agents."  (ECF No. 93-1, p. 25).

[11] For simplicity's sake, unless otherwise indicated, the undersigned refers to the CM/ECF page numbers at the top of the page throughout this opinion.

> that. And we've asked our client whether security footage exists for
> the SJP event, for example, and they have indicated that there isn't.

(ECF No. 90-6, p. 20; Transcript page (Tr.) 102). Defendant also explained that the retention

policy is that when there is active notice of litigation, then from that point any video would be

retained. Otherwise, the normal practice and procedure was to regularly recycle/record over video.

(ECF No. 90-6, p. 20; Tr. 103). The transcript further reflects that because Plaintiff continued to

question how no video could exist, counsel offered to ask him client again about whether any video

existed for those September days. (*Id.*).

Thereafter, Defendant provided a second supplemental response to RFPD 8, describing the

document retention policies that it had produced to Plaintiff:

> Defendant maintains a record retention policy regarding litigation
> and claims that directs relevant employees to retain records related
> to threatened or asserted litigation during active litigation(sic) and
> for five years thereafter.

(ECF No. 93-1, p. 26)[12].

Next, the Court reflects that between July 21-August 28, Plaintiff continues to question the

veracity of the representation that no video footage exists, arguing that should have been able to

video footage. (ECF No. 90-4, p. 16 going forward to p. 2). The Defendant reiterates that its

document retention policy relates to the retention of documents once a threat of litigation exists or

litigation commences. Because litigation did not commence until after Plaintiff's termination,

video footage from September 20-21 was not retained; rather, it was recorded over. Defendant

also produced a declaration of Mr. Marcus Taylor, its Chief of Security. (ECF Nos. 90-4, p. 13;

---

[12] In the Motion, Plaintiff refers to a "Legal Compliance Records Management Policy," which she believes "ensures that Records are kept as long as legally and operationally required, and premature destruction of Official Records are strictly prohibited." (Motion, p. 22). Plaintiff fails to provide a copy of said document to the Court, so the undersigned could not interpret the language of the policy nor draw any reasonable inferences therefrom. Reading these phrases in isolation does not provide the Court with sufficient facts to infer that Defendant's recording over the video footage violated a document destruction policy requirement.

90-5).  Defendant offered to make Mr. Taylor available for a deposition, and Plaintiff initially agreed to avail herself of this offer.  Later, Defendant again offered to make Marcus Taylor available for a deposition.  However, this time, Plaintiff refused to depose Mr. Taylor, ultimately saying that she will call him as a witness at trial instead of seeking to take his deposition.  (ECF No. 90-4, starting with p. 23 reading until page 21, and then resuming at p. 17 and ending with p. 2. In other words, reading from back to front).[13]

In sum, the key evidence before me as to whether the video footage exists for September 20, 2017 comes in the form of Marcus Taylor's declaration[14] and Defendant's supplemental responses to RFPD 8.  Plaintiff has not put any other *evidence* (not argument) to suggest that September 2017 video footage actually exists.

In addition, although Plaintiff did not put in front of the Court evidence as to when she notified the Defendant that she was contemplating filing suit, she made a general reference to her "Amended Complaint an its Exhibit A (MGM Complaint)," as providing notice to the Defendant. (Motion, p. 23).  The undersigned inferred that Plaintiff was referring to her November 20, 2017 letter to the Defendant and reviewed that document, which contains Plaintiff's statements that she is contemplating litigation due to her termination.  The undersigned found that document in the docket.  (ECF No. 22-4, pp. 2-36).  The undersigned analyzed that document, too, as well as the Charge of Discrimination and Notice of Charge of Discrimination.  (ECF No. 93-1, pp. 20-22).

Analyzing the aforementioned, I find that: (a) according to Marcus Taylor, no video footage from September 2017 exists; (b) Defendant's policy is to preserve video footage of all areas of its premises for 14 days, after which time such footage is recorded over; (c) one exception to this policy exists if there is an incident reported by management to security, in which case the

---

[13] *See also* Sections II.B, II.D.
[14] For an analysis of Plaintiff's challenges to Mr. Taylor's declaration, *see* Section II.B.

materials are held indefinitely; (d) when MGM Security is called to escort someone from the premises, and the incident is recorded, such incident is not considered to be significant enough to trigger a duty in Defendant's Security to merit indefinitely; (e) Defendant's document retention policy is triggered upon notice of threatened litigation or active litigation, and requires that materials are kept for five years.

The Court now analyzes the *Charter Oak*/Rule 37 elements to determine whether Plaintiff has met her burden of proof. The Court begins with the third factor: relevance.

### 2. *Relevance*

Although not entirely clear from the Motion, it appears that Plaintiff believes that video footage from one or more of these dates would depict how Ms. Jones "attempted to humiliate Plaintiff" by making "a false report to [MGM] security" that Plaintiff was "irate,"  which "[lead] to Plaintiff being met with security and police officers with canine."  (Motion, pp. 26, 27).

Regarding the relevance of the video footage to her case, Plaintiff asserts that the surveillance footage constitutes:

> the single most incriminating piece of evidence that will indisputably prove that Defendant [is] not credible; Defendan[t]'s stated reason for terminating [her] was pretextual and spurious; and that Plaintiff, who was called a racial slur by [Lisa] Jones just days before her termination, was adversely affected because of her skin color.

(Motion, pp. 22, 23).

The undisputed allegation before me suggests that Plaintiff was terminated on September 21, 2017, and Plaintiff argues that "days before then" Ms. Jones allegedly called her a racial slur. (Motion, p. 21). Interpreting Plaintiff's words "days before" does not lead the undersigned to automatically conclude that Plaintiff is referring to the September 20, 2017 events allegedly captured on video (related to MGM security); if that were the case, Plaintiff would have argued in

the Motion something like "the day before I was fired (September 20, 2017) Ms. Jones called me a racial slur" or "on September 20, 2017 Ms. Jones called me a racial slur." Thus, the undersigned could find that I could not reasonably infer that the video footage to which she refers is relevant to her claim that Ms. Jones discriminated against her (she was fired) because of her color.

Alternatively, the Court decided to give Plaintiff, who is *pro se*, the benefit of the doubt that perhaps she did not articulate her argument as clearly as she would have liked. Thus, *generously* assuming: (a) that the racial slur related to her color; (b) that it was uttered on or about September 20, 2017, either before or during the time of her interaction with Jones (which resulted in MGM security being called to escort Plaintiff off of the premises); (c) that Jones's decision to call MGM security had something to do with Plaintiff's color; and (d) the interaction with Jones was actually captured on surveillance video, then a reasonable factfinder could conclude that the video footage --when considered in conjunction with other relevant evidence from the Plaintiff establishing causation-- could help the Plaintiff establish her claim that her September 21, 2017 termination was based on her color.[15]

Thus, if the Court generously construes Plaintiff's arguments, Plaintiff has met her burden to establish that a "reasonable factfinder could conclude that the [evidence] would have supported her claim." *Charter Oak*, 908 F.Supp.2d at 678.[16]

---

[15] The term "relevance" has been "broadly construed to encompass **any** possibility that the information sought **may be** relevant to the **claim** or **defense** of any party." *O'Malley v. Trader Joes East, Inc.*, Civ. No. RDB 19-3273, 2020 WL 6118841, at *3 (D. Md. Oct. 15, 2020)(internal citations and quotation marks omitted)(emphasis supplied). This is a pretty low threshold.

[16] Regarding Rule 37(e) and whether the ESI "cannot be restored or replaced through additional discovery," Plaintiff has not put any evidence in front of me that additional discovery, e.g., a deposition of Lisa Jones or a deposition of Marcus Taylor, could not have replaced what was lost by the non-preservation of video footage. *See generally Steves, supra*, 327 F.R.D. at 103.

3. *Duty to Preserve*

The undersigned analyzed the first *Charter Oak* element and the first element under Rule 37(e): whether Defendant had an obligation to preserve the video footage at the time that it was recorded over.

As a preliminary matter, it is worth stating that "there is no general duty to preserve documents, things or information, whether electronically stored or otherwise." *Victor Stanley*, *supra*, 269 F.R.D. at 520. Rather, a party seeking spoliation sanctions must establish that the party with the evidence had an obligation to preserve it. *Charter Oak Fire Ins. Co., supra*, at 678.

Correspondence that threatens litigation likely triggers a party's due to preserve evidence, because at that point a party has reason to anticipate litigation and implement a litigation hold to preserve evidence for use in the likely litigation. *Goodman v. Praxair Services, Inc.*, 632 F.Supp.2d 494, 511 (D. Md. 2009); *see also Turner v. United States, supra*, 736 F.3d at 282(no duty to preserve in the absence of any correspondence threatening litigation). Once a lawsuit has been filed, a party is clearly on notice of a duty to preserve evidence.

In addition, the date that an employer receives notice of an EEOC Charge filed by an employee triggers a duty to preserve evidence relevant to the Charge. *See EEOC v. New Breed Logistics*, Civ. No. 10-2696 STA/TMP, 2012 WL 4361449, at *6 (W.D. Tenn. Sept. 25, 2012)(defendant's duty to preserve evidence arose at time it received notice of plaintiff's EEOC charge); *Zublake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)(duty to preserve evidence arose when plaintiff filed EEOC charge).

Analyzing the law, the Court first finds that Plaintiff first notified Defendant of her intent to sue on or about November 20, 2017, roughly sixty days after she was terminated. Thus, on or about November 20, 2017 is the first date that Defendant had an obligation to preserve evidence.

*See Goodman* and *Turner.*[17]  Second, the reasonable inference drawn from Mr. Taylor's declaration is that the September 20 video footage was likely recorded over, per Defendant's customary practice, 14 days after it was created; i.e., on or about October 4, 2017.  Thus, the reasonable inference drawn from the evidence put before me is that video footage of September 20, 2017 no longer existed by the time that Plaintiff sent her November 2017 letter to the Defendant.  Third, Plaintiff has not established that Defendant knew that the video footage would be relevant to a potential legal claim before receipt of her letter in November 2017.  Put another way, Defendant did not have a reason to anticipate litigation and implement a litigation hold to preserve evidence for use in the likely litigation until November.  Furthermore, on the evidence put before me, the Court cannot find that Defendant's document retention policy, which requires that materials are kept for five years, was triggered before November 2017.

Even if the Court analyzes the facts under a case cited by the Plaintiff, the Court does not reach a different conclusion.  This case is factually distinguishable from *QueTel, supra*, 819 Fed. App'x at 156.  In *QueTel*, Defendants received a cease-and-desist letter from Plaintiff notifying them of potential litigation involving a particular software product that a former *QueTel* employee allegedly misappropriated to the Defendants' benefit.  Despite receiving that letter, the computer used to develop that software product was destroyed, and the Defendants --who had received a discovery request from Plaintiff about that computer-- failed to disclose that the computer had been destroyed until Plaintiff's counsel confronted them about the destruction.  The *QueTel* court also found that Defendants deleted a "source code control system" and files related to another computer while the parties were in the midst of a discovery dispute about the system. 819 Fed.

---

[17] Plaintiff argues that the date that Defendant received notice of her EEOC Charge of Discrimination triggered its duty to preserve.  (Motion, p. 24).  The evidence before me is that Defendant received such notice on May 14, 2018, *see* ECF No. 93-1, p. 22, which is roughly five months after she sent her December 2017 letter to the Defendant. Defendant contends that May 14 is the first date that its obligation to preserve evidence arose.  The Court disagrees.

16

App'x at 156.  The magistrate judge in *QueTel* found that the cease-and-desist letter put Defendants on notice of potential litigation and that they had a duty to preserve the computer, yet they intentionally destroyed the computer "with the intent of depriving [plaintiff] of the evidence's use in [the] litigation." *Id.*  The magistrate judge further found that "Defendants' purposeful spoliation effective deprived [plaintiff] of its ability to pursue [two of its claims." *Id.* Under such circumstances, the court imposed judgment against the Defendants because "no less drastic sanction would adequately address the prejudice suffered by [the plaintiff.]."  819 Fed. App'x at 156.  In the instant case, Plaintiff did not put forth evidence that the Defendant knew that surveillance footage was relevant and it had a duty to preserve it at the time that the surveillance footage was destroyed. Indeed, the duty to preserve evidence did not arise until after the surveillance footage had been destroyed in the ordinary course of business.

In sum, Plaintiff has not met her burden of demonstrating that Defendant had an obligation to preserve the September 2017 video when it was recorded over on or about October 4, 2017. *Charter Oak*, *supra*, at 678.  Nor can the Court find that Plaintiff has met her burden under Fed. R. Civ. P. 37(e), i.e., in demonstrating that the video footage constituted "ESI [that] should have been preserved" but was "lost" due to Defendant's "failure to take reasonable steps to preserve" the video. *Jennings, supra*, at 265.

### 4.   State of Mind of Defendant When Video Recorded Over

The Court next examined the second *Charter Oak* element, whether the party who destroyed the evidence did so with a "culpable state of mind."  *Goodman, supra*, 632 F.Supp. 2d at 509.

Plaintiff contends that Defendant "knew that the video footage would be relevant to a potentially legal claim, especially in a termination case that involved Plaintiff being mistreated

and escorted out of the building," and that Defendant made no efforts to preserve the video footage, even though its corporate policy required it to do so. (Motion, p. 25). Defendant counters that because the video footage was recorded over in the normal course of business, it lacked a culpable state of mind.

To prevail on a spoliation sanction, the movant must establish that the party that destroyed the evidence was at fault: i.e., acted with "bad faith, willfulness, gross negligence, or ordinary negligence." *Victor Stanley, Inc., supra*, 269 F.R.D. at 520 (*citing Goodman, supra,* 632 F.Supp.2d at 518). Thus, a court must consider a party's state of mind when determining whether a sanction is appropriate. *Id.* at 529. "Ordinary negligence" means that a party failed to "identify, locate, and preserve evidence, where a reasonably prudent person acting under like circumstances would have done so." *Membreno v. Atlanta Restaurant Partners, LLC.*, 338 F.R.D. 66, 72 (D. Md. 2021)(further citation omitted). "Gross negligence requires a similar showing as ordinary negligence, but to a greater degree." *Membreno*, at 72. A court can find willfulness and bad faith when a party's conduct is "intentional, purposeful, or deliberate." *Victor Stanley, supra*, 269 F.R.D. at 529. "Bad faith" means that a party destroys evidence "for the purpose of depriving the adversary of evidence." *Membreno*, at 73(citing *Goodman*, 632 F.Supp. 2d at 520). "Willfulness [requires] a demonstration of intentional or deliberate conduct resulting in spoliation." *Id.* (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008).

Plaintiff has not met her burden of demonstrating, by clear and convincing evidence, that Defendant acted with ordinary negligence. Indeed, because there was no evidence that Defendant knew of Plaintiff's potential lawsuit until approximately sixty days after she was terminated, and given the Defendant's video recordation policy, the Court cannot find that a "reasonably prudent person," should have identified, located, and preserved evidence before November 2017.

Similarly, the Court cannot find that Plaintiff has met her burden on establishing "gross negligence." Plaintiff has also failed to meet her burden on establishing "bad faith." Plaintiff has not put evidence in front of me that, at the time that the September 20, 2017 video footage was recorded over, Defendant did so with the intent to deprive her of the evidence. Indeed, Mr. Taylor's declaration suggests otherwise: the video footage was likely recorded over on or about October 14, 2017 due to the 14-day policy. Finally, Plaintiff fails to meet her burden of demonstrating that Defendant intentionally or deliberating spoliated evidence.

In sum, because Plaintiff has not established that the destruction or loss was accompanied by a culpable state of mind at the time that the evidence was recorded over, no spoliation sanction of any kind is warranted under *Charter Oak.* Relatedly, Plaintiff has not carried her burden under Rule 37(e) that Defendant acted with the intent to deprive her of the use of the video footage in her litigation.

Accordingly, her Motion is denied as to the spoliation issue.

**B. Video Footage and Marcus Taylor**

    1. *Arguments*

Plaintiff next argues that Defendant "h[as] refused to turn over" the September 20, 2017 video footage, and that the Defendant provided a questionable declaration from Marcus Taylor to support its theory that such footage no longer exists. (Motion p. 26-27). Relatedly, Plaintiff accuses the Defendant of using this declarant "as a pawn [to execute their cunning plan so that they could serve discovery for an improper purpose." (Motion, p. 27). Plaintiff also asserts that Taylor's declaration is "null and void because he has no personal knowledge of any of the events surrounding the Plaintiff, including the relevant security footage, which is confirmed in his Declaration." *Id.* Furthermore, Plaintiff asserts that Defendant's counsel acted in bad faith: "in

their bid to impede and discourage Plaintiff from contacting Mr. Taylor, [counsel reveals] that they cannot supply" Mr. Taylor's contact information to her because "they represent him, so any communication would have to come through them." (Motion, p. 27).  As the Court understands Plaintiff's arguments, then, counsel for the Defendant "broke Rule 26 of the Federal Rules of Civil Procedure" by: (a) refusing to turn over video footage; (b) obtaining a declaration from Marcus Taylor, who has "no personal knowledge of the events surrounding Plaintiff," so his declaration is somehow unreliable; and (c) blocking Plaintiff from contacting Mr. Taylor directly (by herself) so that she could learn his basis of knowledge/test the validity of the declaration.  According to Plaintiff, then, "grounds for sanctions via Rule 26(g)" should be imposed on Defendant's counsel. *Id.*

As a preliminary matter, Plaintiff does not identify a particular sanction that she seeks; rather, she avers that "Rule 26(g) calls for an 'appropriate sanction.'" (Motion, p. 28).

### 2.   *Evidence Related to Marcus Taylor's Declaration*

As stated above, Plaintiff bears the burden of proving that misconduct occurred by "clear and convincing evidence." *Glynn*, 2010 WL 3294337, at *2.

Plaintiff has submitted the declaration of Marcus Taylor, which was executed on August 9, 2023. (ECF No. 90-5, pp. 13,14).  The undersigned has reviewed the declaration.  According to Mr. Taylor's declaration, which he executed under penalties of perjury, he began serving as the Director of Security at MGM National Harbor in October 2017.  (ECF No. 90-5, "Declaration," ¶ 2).  Mr. Taylor also states that it is through his positions with MGM that he is "knowledgeable of MGM National Harbor's security and video surveillance policies." (Declaration, ¶ 3).  He further states that the video retention policy for all "non-gaming areas" is 14 days, after which such "surveillance videos are recorded over automatically." (Declaration, ¶ 4).  The exception to this

practice is "when there is a *reported* incident, in which case management will send Security a request to retain the surveillance indefinitely." (*Id.*)(emphasis supplied). Mr. Taylor provided a "typical example" of a request received by Security to keep footage, which relates to "slip and fall" incidents. Upon receipt of such a request from management, "the footage is stored indefinitely." (Declaration, ¶ 5). Mr. Taylor also declared that MGM Security can be called to "escort someone from the property." However, such incidents "do not rise to the level of severity to require retention of the surveillance footage indefinitely." (Declaration, ¶ 6). According to Mr. Taylor, the September 20, 2017 incident involving Security and Plaintiff "did not rise to the level of severity to warrant retention of surveillance footage from that date (September 20, 2017) indefinitely." (Declaration, ¶ 7). Finally, Mr. Taylor declared that he "confirmed that there is no relevant video footage of Ms. Felder's removal from the MGM property in September 2017." (Declaration, ¶ 8).

The undersigned also reviewed the evidence that Plaintiff put in front of me related to her email communications with Defendant about Mr. Taylor and his declaration. *See* ECF No. 90-4, staring with p. 23 reading until page 21, and then resuming at p. 17 and ending with p. 2.[18]

The evidence reflects that on July 12, Plaintiff began reviewing Defendant's third supplemental responses to her discovery requests and documents and noted that Defendant "failed to supply any of the requested video and audio production(s);" Plaintiff then asked counsel whether Defendant was "going to supply the requested video productions; or, if not, what is the reasons(s) [the Defendant] gives for not doing so." (ECF No. 90-4, p. 23). Defendant responds that it "does not have any responsive video or audio recordings in its possession, custody or control," and that

---

[18] Reading the emails in this fashion puts the events in chronological order.

it had "conducted a reasonable search and all video and audio recordings related to the SJP

Boutique and other identified areas do not exist." *Id.* Plaintiff challenges the representation:

> 1. It is beyond reality and comprehension to believe that your
>    Client does **not** have any responsive audio or video recordings.
>    **Firstly**, any of MGM's properties are required to have working
>    cameras and video of every public area of their facilities.
>    **Secondly**, in **all** of the incident reports, some within and around the
>    SJP Boutique, MGM Security and personnel were able to go back
>    and literally view and obtain video footage. . .However, your Client
>    is telling me that for all of September they have **NO** footage?That is
>    extremely hard to believe…**Thirdly**, as brought out in the MGM
>    Records Management Policy, it is MGM's policy to obtain any
>    footage for as long as possible, especially to that regarding legal
>    matters, even if it is outside the timeline that they usually keep
>    footage.

(ECF No. 90-4, p. 22) (no alterations to the original).  Counsel for the Defendant replies that it

inquired of Defendant about recordings from September 20-September 21, 2017 and the Defendant

said that "there were no archived recordings from these dates," as the security department does not

"keep footage of every incident in which it was involved." (ECF No. 90-4, p. 21).  Defendant also

notified Plaintiff that it "preserved documents(sic) from the time that it first became aware of your

claims-after you filed you Charge of Discrimination," and that "security footage automatically

overwritten per its practices prior to that date no longer exists."  (*Id.*).

Next, the emails reflect that between July 21-August 28, Plaintiff continues to question

the veracity of the representation that no surveillance footage exists, and alleges that Defendant's

"very own Company Policy [explicitly states] that Defendant should have and be able to produce

such files." (ECF No. 90-4, p. 16 going forward to p. 2).  The Defendant responds that it produced

to Plaintiff a copy of its document retention policy, which relates to the retention of documents

"once litigation or a threat of litigation commences."  Because litigation did not commence until

after Plaintiff's termination, video surveillance from September 20-21 was not retained; rather, it was recorded over.  Defendant ends that email communication by saying:

> we are happy to provide you with a declaration that outlines the above, but do not intend to address this issue any further after that. Nat'l Harbor has produced documents and communications beyond the scope of its obligations concerning your one remaining claim.

(ECF No. 90-4, pp. 15, 16).  Plaintiff responded that she appreciated the declaration, (ECF No. 90-4, pp. 9, 10)(August 18, 2023); Plaintiff said that she also wanted a declaration of a third party whom she believed stores MGM National Harbor's surveillance records.  (August 11, 2023, ECF No. 90-4, p. 12; p. 11).  In response, the Defendant stated that Mr. Taylor has "confirmed that there is no third-party Custodian that store's [the Defendant's] surveillance records," and that Defendant provided a copy of Mr. Taylor's declaration to Plaintiff.  (ECF No. 90-4, pp. 12, 13).  The record also reflects that Defendant offered to make Mr. Taylor available for a deposition and would coordinate that date. (ECF No. 90-4, p. 3).  Plaintiff agreed to avail herself of this offer.  (ECF No. 90-4, p. 7)(August 23, 2023).  Plaintiff also agreed to discuss further during a status conference that they were planning.  (ECF No. 90-4, p. 5)(August 25, 2023).  Defendant again offered to make Marcus Taylor available for a deposition.  (ECF No. 90-4, p. 4)(August 28, 2023).  However, this time, Plaintiff refused to depose Mr. Taylor, ultimately saying that she will call him as a witness at trial instead of seeking to take his deposition.  (ECF No. 90-4, p. 3).[19]

        3.  *The Law and Analysis*

Rule 26(g) identifies the obligations of a party's counsel and a *pro se* party when responding to discovery requests.  The responsibilities include signing every discovery request, response, and objection, which signifies that a party's attorney or *pro se* party "certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" that,

---

[19] *See also* Section II.D.4., *infra.*

e.g., the disclosure is complete or a discovery request or an objection is consistent with the rules. *See* Fed. R. Civ. P. 26(g)(1)(A), (g)(1)(B)(i) through (g)(1)(B)(iii). The Advisory Committees Notes to the 1983 Amendments to Rule 26(g) state that parties have an "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37." That Advisory Committee Note also provides that "Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Id.* In addition, a party's attorney and a *pro se* party have an obligation to "approach the [discovery] process properly;" in other words:

> discovery must be initiated and responded to responsibly, in accordance with the letter and spirit of the discovery rules, to achieve a proper purpose. . .and be proportional to what is at issue in the litigation.

*Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 360 (D. Md. 2008).

A movant who alleges that an opposing party has violated Rule 26(g) has the burden to establish the nature of the misconduct that warrants sanctions. However, because "the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit. . .proving misconduct occurred by 'clear and convincing' evidence, as opposed to by a mere preponderance [of the evidence] certainly suffices." *Glynn v. EDO Corp.*, Civ. No. JFM 07-1660, 2010 WL 3294337, at *2 (D. Md. Aug. 20, 2010)(quoting *Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010)).

Taking all of the aforementioned into account, the undersign now addresses whether Plaintiff has met her burden to establish that Defendant violated Fed. R. Civ. P. 26(g). The Court declines to so find.

First, the only evidence before me on the existence/non-existence of the September 20-21 video footage comes in the form of Mr. Taylor's declaration  Reviewing that declaration, Mr.

Taylor clearly states that he has confirmed that no video surveillance related to Plaintiff's removal from the property exists.  (Declaration, ¶ 8).  Because the only evidence before me is that no video footage exists, the undersigned cannot find that Defendant is "refusing" to turn over non-existent evidence.

Second, because Mr. Taylor says that he began working at MGM National Harbor Security in October 2017, *see* Declaration, ¶ 2, the reasonable inference that the undersigned first draws is that Mr. Taylor was working at MGM within a month or no later than 40 days after Plaintiff was terminated from MGM in September 2017.  Next, Mr. Taylor also clearly states that it is through his positions with MGM that he is "knowledgeable of MGM National Harbor's security and video surveillance policies."  (Declaration, ¶ 3).  Thus, he clearly articulates his basis of knowledge.  While it is true that Mr. Taylor has "no personal knowledge of the incidents surrounding Plaintiff," that does not automatically signify that his declaration was unreliable.  Plaintiff has not proffered any evidence to this Court to support her belief that Mr. Taylor's testimony is unreliable.  If Plaintiff had questions about the veracity of his statements, she could have chosen to depose Mr. Taylor.  Had Plaintiff deposed Mr. Taylor, she could have vigorously questioned him about his basis of knowledge when writing the declaration, and challenged his understanding of MGM's video surveillance retention policies.  She declined to do so.  In the absence of any evidence of, e.g., inconsistent statements made by him, the undersigned cannot find his declaration to be unreliable.

Third, Plaintiff claims that Defendant's refusal to allow her to speak to Mr. Taylor by herself amounts to misconduct.  The Court disagrees.  After Defense counsel provided Plaintiff with Mr. Taylor's declaration, Plaintiff responded that she would like his contact information.  (ECF No. 90-4, pp. 10, 12, 15, 16).  After that time, counsel for Defendant explained that they

represented Mr. Taylor and that she would need to contact him via counsel.  Defendant's counsel also suggested that if she would like to notice his deposition, counsel was "happy to facilitate his deposition with you at a mutually agreeable date and time."  (ECF No. 90-4, pp. 8-10).  Plaintiff replied: "In regard to MGM National Harbor's security, yes, a deposition will be necessary. Please inform me of possible days and times for that as well."  (ECF No. 90-4, p. 7).  Defendant's counsel responded that it would "speak with our client about arranging" his deposition, and Plaintiff said that she would "await the information regarding the details surrounding the deposition of the security officer."  (ECF No. 90-4, p. 5).  A few days later, on August 28, 2023, counsel for the Defendant responded that she would "coordinate available dates and time(sic) in the next few weeks for Mr. Taylor," and that Plaintiff would have to schedule and coordinate the court reporter for his deposition.  (ECF No. 90-4, p. 4).  Ultimately, Plaintiff declined to depose Mr. Taylor.  It is worth noting that during the April 2023 meet and confer session, Defendant's counsel notified Plaintiff that if she wanted to depose current employees of Defendant, she needed to facilitate the same through counsel.  (ECF No. 90-6, p. 44; Tr. 321-323).  When so told, Plaintiff summarizes her understanding of this protocol, and then she says "Okay. That's perfect. That will work. That's great."  (ECF No. 90-6, p. 44; Tr. 323).

As stated above, a Rule 26(g) certification is designed to curb discovery abuse by requiring a *pro se* party and an attorney to approach the discovery process "properly" and "responsibly." Based on my review of the *evidence* before me, the undersigned cannot find that Defendant's conduct related to Mr. Taylor's declaration was improper or done in a manner that violated the spirit and purpose of the discovery rules.  Plaintiff has not met her burden that a violation of Rule 26(g) occurred.

In sum, the Motion is denied as to this issue.

### C.  Requests for Admissions

Plaintiff avers that Defendant has willfully and intentionally failed to admit factual matters with request to the majority of the twenty-nine Requests for Admission that she served upon it.  In particular, Plaintiff asserts that: (a) Defendant "answered in part 5 Requests" (Requests 7, 10, 14, 15, and 27); (b) Defendant "answered evasively 5 Requests" (Requests 11, 14, 15, 16, and 22); Defendant "did not answer" 10 Requests (Requests 1, 2, 3, 5, 6, 11, 24, 26, 28, and 29); and  (c) Defendant answered "with lies and falsehoods 5 Requests" (Requests 2, 3, 5, 6, and 8).  (Motion, p. 28).

Fed. R. Civ. P. 36 permits a party to:

> serve on any other party a written request to admit, for the purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to facts, the application of law to fact, or opinions about either; and the genuineness of any described documents.

*See* Rule 36(a)(1).  The primary purpose of an admission under Rule 36 is to "'to narrow the array of issues before the court, and thus expedite both the discovery process and the resolution of the litigation.'"  *Lynn v. Monarch Recovery Mgmt.*, 285 F.R.D. 350, 363 (D. Md. 2012)(quoting *EEOC v. Balt. Cnty.*, Civ. No. L-07-2500, 2011 WL 5375044, at *1 (D. Md. Nov 7, 2011).

Upon receipt of a request for admission, the responding party has several options.  For instance, if the responding party has a legitimate objection to a request, the responding party may so assert it.  *Lynn,* 285 F.R.D. at 363 (analyzing Rule 36(a)(5)).

Alternatively, a responding party who receives a request for admission may admit to the matter raised.  *See generally Quan v. TAB GHA F&B, Inc.*, 2020 WL 9349573, at *4 (D. Md. Nov. 25, 2020).  Next, if a matter is not admitted, the responding party must "specifically deny it or state in detail why the[responding] party cannot truthfully admit or deny [the matter]."  *See* Rule

36(a)(4).  That denial "must fairly respond to the substance of the matter." *Id.*  In addition, if good

faith exists to require a responding party to qualify its answer or deny part of a matter raised, then

that answer "must specify the part admitted and qualify or deny the rest."  *See* Rule 36(a)(4).

If a requesting party thinks that the responding party's answer is insufficient or an objection

is impermissible under the Rule, then the requesting party may file a motion asking a court to rule

on the sufficiency of an answer or an objection.  Rule 36(a)(6).  A court must decide whether the

answers or objections comply with Rule 36(a)(4), (a)(5).  If they do not, the court must determine

whether a matter is deemed admitted or an amended answer to the request for admission is

required.  *EEOC v. Balt. Cnty.*, *supra*, 2011 WL 5375044, at *2.  If a responding party provides

evasive answers or "fails to respond to the substance of the question, and the **evidence** establishes

that the request should [be] admitted, the Court may deem the matter admitted." *Lynn*, *supra*, 285

F.R.D. at 363 (quoting *EEOC v. Balt. Cnty.*, *supra*, 2011 WL 5375044, at *2)(emphasis supplied).

Plaintiff advances several theories of how she believes Defendant engaged in misconduct.

For example, she posits that "Defendant would raise objections to any of Plaintiff's Requests that

involved anyone or anything outside of the Plaintiff," or "Any of the questions that related to color-

which is the prevailing claim that brings forth the civil action-Defendants would not answer or

provide evasive answers, instead admitting to the race of the individual, which Plaintiffs did not

ask." (Motion, p. 29).  However, Plaintiff does not provide this Court with **evidence** (facts, not

allegations) to support her contention that the Defendant's answers are improper.  For example,

Plaintiff did not refer to specific deposition testimony or to specific documents, which the Court

could analyze and compare with the answers Defendant gave, to determine whether an answer is

insufficient or evasive or false.  Not providing evidence prevents the Court from being able to

carefully analyze whether Defendant's objection was improper or whether its answers violate or

comply with Rule 36(a)(4), (a)(5), and if they do not comply, to determine whether a matter is deemed admitted or an amended answer to the request for admission is required.

Accordingly, the Court's review could only be very general, and had to be limited to what is in front of it, which is ECF No. 90-3, pp. 1-31. Reviewing the Defendant's answers to the Requests for Admission, the undersigned finds that Defendant admitted, denied, or partially admitted or denied the RFAs. Defendant also qualified some of its answers. Without evidence, I must find that there is nothing facially improper about this practice. *See, e.g.* Rule 36(a)(4). In addition, some of Plaintiff's Requests, e.g., Requests 1-6, ask Defendant to admit to whether she is "light-skinned" and whether other individuals are "dark-skinned." The Requests do not define those terms. More important, Plaintiff's color --and whether she was discriminated based on her skin tone-- is a central issue in dispute. Defendant's "responses are not insufficient simply because they refuse to admit facts that are central to [Plaintiff's] dispute." *Crumb v. McDonald's Corp.*, Civ. No. DKC 15-1719, 2016 WL 6822481, at *1 (D. Md. Nov. 18, 2016); *see also Uribe v. Aaron's Inc.*, Civ. No. GJH 14-022, 2014 WL 4851508, at *3 (D. Md. Sept. 26, 2014)(court declined to treat party's untimely responses to requests for admissions as admitted facts because "requests for admission as to central facts in dispute are beyond the proper scope of the rule that requests not specifically denied or objected to in writing shall be deemed admitted")(further citation omitted).

In short, on this record before the Court, the Court cannot find that Defendant violated Rule 36. Accordingly, the Motion is denied as to this issue.

### D. Discovery Orders and Litigation Practice, Including Conduct related to Depositions

Plaintiff contends that Defendant has abused the discovery process, articulating four different instances that she believes demonstrate how Defendant has engaged in misconduct.

(Motion, pp. 29-32).  Plaintiff seems to argue that some of the misconduct arose after the parties were required to file attestation forms, which she believes signifies that Defendant has violated a court order.  (*Id.*).

As a preliminary matter, it bears repeating that it was only after reviewing the parties' written filings related to Plaintiff's motion to compel that the undersigned found that *both* sides were not on track related to their discovery obligations.  During the March 2023 hearing, the Court found that *both* parties: (a) would be required to file attestation forms certifying familiarity with and an agreement to abide by the Federal Rules of Civil Procedure, including Rule 26(b)(1), and the Local Rules  of the District of Maryland (D. Md. 2023); (b) would be required to attend a meet and confer session, with a court reporter present to generate a transcript; and (c) would need to make good faith efforts resolve the outstanding discovery issues.  (ECF No. 72).  The Court further held that during that meet and confer session, Plaintiff would have to demonstrate a sufficient factual basis for her requests and to establish the relevance and proportionality of those discovery requests, and the Defendant would be given the opportunity to object to the requests, but those objections could not be boilerplate.  (*Id.*).  The undersigned also reminded Plaintiff that if she wanted to take any deposition (written or oral), or to ask for any more discovery, she was to discuss with Defendant's counsel and complete everything to which she was legally entitled during discovery.  (*Id.*).

The attestation forms were completed in March 2023, i.e., before the parties April 10, meet and confer session.  (ECF Nos. 76, 77).

Next, the undersigned has reviewed the entire transcript of the meet and confer session. (ECF No. 90-6).  The undersigned finds that, regrettably, Plaintiff does not appear to fully understand the Court's rulings.  The undersigned further finds that despite the Court's admonition

30

to the Plaintiff, there were many of her discovery requests that were not relevant nor proportional to the case. Plaintiff misconstrued the undersigned's order to permit her to obtain everything that she asked for, regardless of relevance. Defendant appropriately and reasonably questioned the relevance and proportionality of Plaintiff's requests, as the Court ordered (during its March 2023 hearing) that Defendant could do. Defendant repeatedly offered to supplement its responses to Plaintiff's discovery requests, and repeatedly sought reasonable compromises. The Court did not find that either side behaved uncivilly or act in bad faith during the meet and confer session. *See, e.g.,* ECF No. 90-6, pp.11-14, 17, 20-21, 31, 34-35, 36-39, which are Tr. 19-23, 24-27, 28-29, 35-39, 41, 42, 43, 44-46, 47-48, 77-78, 105-108, 202-203, 207, 231-238, 250-251, 259-260, 263-270, 274. In sum, after reviewing the transcript, the undersigned did not come away with the feeling that Defendant engaging in bad faith or gamesmanship. Instead, the undersigned was left with the impression that Defendant "reset" its behavior, if you will.

With that in mind, below, the Court analyzes the various issues raised by Plaintiff.

1. *Deposition of Lisa Jones*

Plaintiff asserts that Defendant engaged in misconduct related to Ms. Jones' deposition. Specifically, Plaintiff maintains that Defendant misled her into thinking that Jones deposition (and Patrick Fisher's deposition) "would be conducted, only to find that the Defendants would cancel both depositions for unexplained reasons on the weekend before the close of Discovery." (Motion, pp. 30-31). Plaintiff also complains that she "never received notice and never received a copy of the questions" that Defendants asked Ms. Jones that led to Jones providing a declaration. (Motion, p. 30).

As a preliminary matter, the burden is on Plaintiff to establish that sanctions are appropriate.  *See generally Glynn v. EDO Corp.*, Civ. No. JFM 07-1660, 2010 WL 3294337, at *2 (D. Md. Aug. 20, 2010).

The circumstances related to Defendant's conduct and Ms. Jones' deposition occurred in February, 2023, which is *before* the parties were directed to file attestation forms in March, and before the April 2023 meet and confer.  The record before me reflects that, on February 25, the Defendant notified Plaintiff that the Lisa Jones' deposition, which was scheduled for February 27, was being cancelled.  (ECF No. 90-4, pp. 28, 29).  However, counsel for the Defendant did not explain to Plaintiff why the cancellation occurred.  Instead, Plaintiff was told "I am confirming again that the depositions previously noticed for today have been cancelled. We notified you as soon as we learned the depositions would not be going forward."  (ECF No. 90-4, p. 28).  The record before me also reflects that the declaration of Lisa Jones was executed on February 24, 2023.  (ECF No. 90-5, p. 8).

Next, Plaintiff represents that "on the day of the close of Discovery," she "would shockingly find the Declaration of Lisa Jones, which she would not have time to review before the March 02nd (sic) Discovery Dispute Hearing."  (Motion, p. 30).  The record further reflects that, at that time, discovery was set to close on February 28, 2023.  Thus, the undersigned infers that Plaintiff received Jones' declaration on February 28, 2023, i.e., two days before the March 2 discovery dispute hearing.

In the Motion, Plaintiff asserts that she "would later find that Jones' declaration was inundated with outright lies.  But because Discovery had closed, [she] could not inquire or attempt to rectify the situation, prompting Judge Simms to reprimand the Defendants."  (Motion, p. 30).

Reviewing all of the evidence put before the Court by the parties, the undersigned finds that Defendant notified Plaintiff on Saturday February 25 that it was cancelling the February 27 depositions of Jones and Fisher; indeed, this last-minute, weekend notice did not provide Plaintiff with at notice at least one business day in advance. Such conduct strikes the undersigned as discourteous, unfair, and worthy of some sort of sanction.

To that end, Fed. R. Civ. P. 30(g) provides that "a party who, expecting a deposition to be taken, attends in person. . .may recover reasonable expenses for attending, including attorney's fees, if the noticing party failed to: (1) attend and proceed with the deposition." At least one court within the Fourth Circuit has held that an award of reasonable costs is an appropriate sanction for a party who noticed a deposition, and then tells the opposing party at the last minute that the deposition is being cancelled. *See Pine Lakes Int'l Country Club v. Polo Ralph Lauren Corp.*, 127 F.R.D. 471, 472-73 (D.S.C. 1989). In *Pine Lakes,* the plaintiff alleged that the defendant noticed a deposition for a certain date, and on the morning of the deposition its attorney traveled to the location where the deposition was to occur. When the attorney arrived, he was told that the deposition had been cancelled. The defendant offered a counter-narrative, namely that the day before the deposition, its counsel had left a voice mail message for the plaintiff's attorney notifying him that the deposition scheduled for the next day was cancelled. The court sided with plaintiff, finding that because the defendant noticed the deposition it "retained the burden of cancelling said deposition, and conveying this information to defendant in sufficient time to prevent defendant from incurring the expense of travelling to the site of the scheduled deposition." 129 F.R.D at 472. Thus, the *Pine Lakes* court ordered the defendant to pay "reasonable expenses incurred in attending the scheduled deposition, including  reasonable attorney's fees." *Id.*

However, the undersigned does not believe that ends the analysis.  The record reflects that Ms. Jones' deposition was to occur remotely.  (ECF No. 90-4, p. 30).  So, as one court has characterized the issue: "the resolution of the dispute. . .turns on the meaning of 'attend' in the context of Rule 30(g) and remotely held depositions when no witness or attorney is ever required to travel or incur lodging expenses."  *In re: University of San Diego Tuition and Fees COVID-19 Refund Litigation*, Civ. No. 20-1946, 2013 WL 3316765, at * 3 (S.D. Ca. May 8, 2023).  In *In re: University of San Diego*, the plaintiffs cancelled depositions that were to occur remotely about one hour before and/or the day before they were to occur.  The plaintiffs argued that because the depositions had been cancelled, no attorney or witness needed to travel to the deposition, and Rule 30(g) only applies to situations where, e.g., travel and lodging occur to facilitate the attorney's attendance at the deposition.  The court found that, even though no travel, lodging or attendance by an attorney occurred, the attorney still needed to prepare for the witness' deposition, and the time associated with such preparation was a foreseeable and recoverable expense that should be imposed as a sanction against plaintiffs.  2013 WL 33167665, at *4.

Applying the rationale of *Pine Lakes* and *In re: University of San Diego* to the instant case, the undersigned interprets Rule 30(g) to allow for an award of expenses to Plaintiff because Defendant cancelled Jones' remote deposition on a Saturday, i.e., less than one business day before the deposition was to occur.  Defendant did not explain to Plaintiff why Jones' deposition was cancelled.  I find that Plaintiff has met her burden that a sanction is appropriate due to the last-minute cancellation.  Plaintiff, even though she is not an attorney, should be entitled to recover any reasonable expenses that she actually incurred to prepare for Ms. Jones' deposition.

Plaintiff has not identified a specific sanction that she is seeking, and has not stated that she seeks reimbursement for expenses.  *See* Motion, pp. 29-33.  Accordingly, if Plaintiff seeks an

award of expenses, by no later than two weeks from the date that this Memorandum Opinion is issued, Plaintiff shall file a motion for expenses in which she particularizes the amount of time that she spent to prepare for Ms. Jones' deposition and provides reliable information related to expenses incurred in connection with the same.  The undersigned will evaluate that information, and any opposition that the Defendant may file, to ultimately determine whether an award of expenses can occur.[20]

### 2.  *Deposition of Patrick Fisher*

Plaintiff makes similar allegations of misconduct against the Defendant and the deposition of Mr. Fisher. (Motion, pp. 29, 30).  Plaintiff argues that Defendant "only made it a point to receive an "underhanded declaratio[n] from [Ms. Jones and Ms. Wilburn]," and not from Mr. Fisher, who she claimed had testimony that would benefit her. According to Plaintiff, Defendant acted in bad faith.  (*Id.*).

---

[20]      Finally, if Plaintiff seeks some other sanction because she believes that the Defendant's conduct prejudiced her from obtaining Jones' testimony, the Court declines to impose one.  As a preliminary matter, Plaintiff has cited to no authority to support her argument that Defendant was required to provide her with a copy of the questions that it asked Jones in advance of her declaration.  Next, Plaintiff claims that she "would later find that Jones' declaration was inundated with outright lies. But because Discovery had closed, Plaintiff could not inquire or attempt to rectify the situation."  (Motion, p. 30).  The Court does not find this argument to be persuasive.

Evaluating all of the evidence before the undersigned, I hold that: (1) by no later than February 28, Plaintiff had Jones' declaration; (2) by the end of the March 2 hearing, both parties knew that the meet and confer session was on April 10; (3) during the March 2 hearing, the Court made clear to Plaintiff that any depositions that she would like to take would need to happen before the new deadline for discovery; and (4) during the April 10, 2023 meet and confer, Defendant also reminded Plaintiff that she could depose Jones, as discovery had not ended.  (ECF No. 90-6, pp. 10, 16; Tr. 15, 97, 98).  It is unclear, then, why if Plaintiff believed Jones' testimony to be so valuable to her case, she did not choose to subpoena Jones and notice her  deposition, which could occur after April 10 and before the close of discovery.  Indeed, both Fed. R. Civ. P. 30(a)(1) and 45 provide Plaintiff with the mechanism by which she could have secured Jones' testimony. The record reflects that the parties continued to agree to extensions of the discovery deadline, so Plaintiff had more than ample opportunity to try to depose Jones. Thus, the record belies Plaintiff's claim that she had no opportunity to depose of Jones. To the extent that Plaintiff claims that she has limited financial resources to engage in discovery, she did not put such evidence before the Court. In sum, Plaintiff has not met her burden on demonstrating prejudice. Plaintiff cannot credibly claim prejudice to her case if she failed to act and schedule Jones' deposition before discovery closed.

As a preliminary matter, the burden is on Plaintiff to establish that sanctions are appropriate. *See generally Glynn v. EDO Corp.*, Civ. No. JFM 07-1660, 2010 WL 3294337, at *2 (D. Md. Aug. 20, 2010).

As was the case with Ms. Jones' deposition, the record before me reflects that, on February 25, the Defendant notified Plaintiff that Patrick Fisher's deposition, which was scheduled for February 27, was being cancelled.  (ECF No. 90-4, pp. 28, 29).   In addition, the Court now engages in the same analysis as it did above for Ms. Jones, applying the rationale of *Pine Lakes* and *In re: University of San Diego* to the instant case.   Thus, the undersigned interprets Rule 30(g) to allow for an award of expenses to Plaintiff because Defendant cancelled Fisher's deposition on a Saturday, i.e., less than one business day before the deposition was to occur.   And, the evidence before me is that Defendant knew by February 17, 2023 --i.e., one *week* before Fisher's scheduled deposition-- that seven attempts had been made to serve Fisher to no avail.  (ECF No. 93-1, p. 146).   Yet, Defendant offered no explanation to Plaintiff as to why Fisher's deposition was cancelled.  I find that Plaintiff has met her burden that a sanction is appropriate due to the last-minute cancellation.  Plaintiff, even though she is not an attorney, should be entitled to recover any reasonable expenses that she actually incurred to prepare for Mr. Fisher's deposition.

Plaintiff has not identified a specific sanction that she is seeking, and has not stated that she seeks reimbursement for expenses.  *See* Motion, pp. 29-33.  Accordingly, if Plaintiff seeks an award of expenses, by no later than two weeks from the date that this Memorandum Opinion is issued, Plaintiff shall file a motion for expenses in which she particularizes the amount of time that she spent to prepare for Mr. Fisher's deposition and provides reliable information related to expenses incurred in connection with the same.  The undersigned will evaluate that information,

and any opposition that the Defendant may file, to ultimately determine whether an award of expenses can occur.[21]

### 3.   *Declaration of Whitney Wilburn*

Plaintiff alleges that Defendant engaged in misconduct in obtaining a declaration from Whitney Wilburn, who  she contends is "central" to her color discrimination claim. (Motion, p. 30). Plaintiff complains that Ms. Wilburn's declaration is "riddled with untruths and unsupported, unfounded statements that attempted to damage the Plaintiff's reputation and spotless employee record." (*Id.*).  Plaintiff also complains that she did not receive notice that the Defendants were going to obtain a declaration from Ms. Wilburn, which she suggests is indicative of bad faith. Finally, Plaintiff argues that Defendant "only made it a point to receive an "underhanded declaratio[n] from [Ms. Jones and Whitney Wilburn]," and not from Mr. Fisher, which she believes established bad faith. (*Id.)*.

The undersigned has reviewed the record put before me. The Court finds that Wilburn's declaration was executed on June 9, 2023, which was after the parties were directed to file attestation forms in March, and was executed approximately 60 days after the parties April 10 meet

---

[21]     Finally, if Plaintiff seeks a different sanction because she believes that the Defendant's conduct prejudiced her from obtaining Mr. Fisher's testimony, the Court declines to impose one. The record is clear that there is no declaration from Mr. Fisher.  Indeed, Plaintiff argues that sanctions are in order because she believes that the Defendant deliberately decided not to obtain "the testimony of Patrick Fisher who is a key figure that can attest to Plaintiff's exemplary employee work ethic and record."  (Motion, p. 30).  The Court declines to draw the inference that Plaintiff suggests. The evidence before the Court is that attempts were made to serve Mr. Fisher with a subpoena for his deposition, but he attempted to evade service.  (ECF No. 93-1, pp. 144-147).  The Defendant communicated this fact to Plaintiff during the April 10, 2023 meet and confer session.  (ECF No. 90-6, pp. 10, 11; Tr. 17, 18, 23).  Thus, Plaintiff was made aware of this fact at a time that the parties had been instructed to meet and confer and come up with a deadline for the close of discovery.  There is no evidence before me that Plaintiff asked Defendant for additional information about Fisher's whereabouts.  The Court further finds that the undersigned made clear to Plaintiff during the March 2023 hearing that any depositions that she would like to take would need to happen before the new deadline for discovery.  It is unclear, then, why if Plaintiff believed that Fisher's testimony to be so valuable to her case, she did not try to notice Fisher's deposition via subpoena.  That deposition could have occurred after April 10 and before the close of discovery.  The record reflects that the parties continued to agree to extensions of the discovery deadline, so Plaintiff had more than ample opportunity to try to depose him.  In sum, Plaintiff has not met her burden on demonstrating prejudice.  Plaintiff cannot credibly claim prejudice to her case if she failed to act and schedule Fischer's deposition before discovery closed.

and confer session. (ECF No. 90-5, pp. 9-14). The record before the Court also reflects that the during the parties' April meet and confer session, they discussed Wilburn repeatedly. *See, e.g.,* ECF No. 90-6, Tr. 29, 32, 37, 98, 159, 161, 179, 180, 219, 220, 225, 231, 233, 238, 319, 331, 332. That session ended with the Defendant agreeing, for the most part, to supplement its answers to discovery requests, but does not reflect that Plaintiff asked Defendant about scheduling a deposition for Wilburn. *Id.* The record further reflects that Wilburn's declaration was executed on June 9, 2023, which was roughly two weeks before discovery was scheduled to close on June 23, 2023.

Despite these factual findings, however, I cannot find that Plaintiff has met her burden under *Glynn v. EDO Corp.*, Civ. No. JFM 07-1660, 2010 WL 3294337, at *2. Put another way, Plaintiff has not put forth any evidence regarding when she obtained Ms. Wilburn's declaration, nor has she put any evidence before me regarding her efforts to meet and confer with Defendant regarding the same.[22] In addition, Plaintiff has not put any evidence before the Court that Defendant scheduled a deposition of Ms. Wilburn, yet cancelled it. Furthermore, Plaintiff has not put before the undersigned  any evidence that she sought to depose Ms. Wilburn, even though her name came up repeatedly during the April 10 meet and confer.

In sum, Plaintiff has not met her burden, and the Motion is denied as to this issue.

4. *Counsel's Representation of Marcus Taylor*

As stated above, Plaintiff asserts that  Defendant's counsel acted in bad faith: "in their bid to impede and discourage Plaintiff from contacting Mr. Taylor, [counsel reveals] that they cannot supply" Mr. Taylor's contact information to her because "they represent him, so any

---

[22] In her Motion and Reply, Plaintiff suggests that Defendant had an obligation to provide Plaintiff with a copy of the questions that Defendant asked Ms. Wilburn (and Ms. Jones) before obtaining written declarations from them. However, she fails to cite to any Federal Rule of Civil Procedure or any caselaw that obligates the Defendant to do this.

communication would have to come through them."  Motion, p. 27.  Plaintiff further contends that Defendant committed misconduct, namely: "Defendants did not disclose to the Plaintiff that they(sic) are representing him," and that if Plaintiff wanted to depose him, "she would have to make all the arrangements."  Motion, p. 31.

As stated previously, the burden rests with Plaintiff to put forth evidence of misconduct. *See Glynn*, 2010 WL 3294337, at *2.

A review of the email traffic provided by the Plaintiff reveals that all of the communications between Plaintiff and Defendant occurred between July 26, 2023 and August 28, 2023.  Those email communications show that after the parties discussed whether September 20-21 video surveillance existed, Defense counsel provided Plaintiff with Mr. Taylor's declaration, in which he explained that no such video footage existed.  (ECF No. 90-4, pp. 12-15).  Plaintiff responded that she would like his contact information.  (ECF No. 90-4, pp. 10, 12).  After that time, counsel for the Defendant explained that they represented Mr. Taylor and that she would need to contact him via counsel.  Defendant's counsel also suggested that if she would like to notice his deposition, counsel was "happy to facilitate his deposition with you at a mutually agreeable date and time."  (ECF No. 90-4, pp. 8-10).  Defendant's counsel responded that it would "speak with our client about arranging" his deposition, and Plaintiff said that she would "await the information regarding the details surrounding the deposition of the security officer."  (ECF No. 90-4, p. 5).  A few days later, on August 28, 2023, counsel for the Defendant responded that she would "coordinate available dates and time(sic) in the next few weeks for Mr. Taylor," and that Plaintiff would have to schedule and coordinate the court reporter for his deposition.  (ECF No. 90-4, p. 4). During that same communication, counsel attached a draft status report in which

counsel suggested reopening discovery for the limited purpose of allowing Plaintiff to depose Mr.

Taylor.  (*Id.*).  Later that day, Plaintiff responded:

> (3)As to the deposition of the Security personnel and the way that
> this was conducted was also not in line with Court procedures,
> because if it is so (and it is so) that Mr. Taylor is not only represented
> by you, but also deposed by you without my knowledge or ability to
> immediately follow-up with him or to be present at that initial
> deposition, is extremely problematic; but it is in-line with how every
> other deposition has been conducted by you, which, like the others,
> was conducted in ways not adherent to Court procedure.
>> a.) Therefore, no delay for this deposition need be, for quite
>> simply, Mr. Taylor is *now noted as a person to be*
>> *subpoenaed/called/questioned during trial*
>> b.) *There are more than enough discovery materials that can be*
>> *used as an alternative.*
>> c.) The discovery deadline is closed, and need not be extended
>> any further, for what has been done and provided is just so.

ECF No. 90-4, p. 3. (emphasis supplied).

Taking the aforementioned evidence into account, the Court first finds that Plaintiff

initially agreed with the idea of Mr. Taylor's deposition, but later rejected it, suggesting that

Defendant's counsel had engaged in misconduct, by "deposing" him "without her knowledge" or

"[her] ability to immediately follow up with him or to be present at the initial deposition."  (ECF

No. 90-4, pp. 3, 7).  Next, there is no evidence before the Court that Mr. Taylor was deposed;

rather, the only evidence before me is that he executed a declaration regarding Defendant's video

surveillance procedures.  (ECF No. 90-4, pp. 12, 13).  Reviewing the transcript of the April 2023

meet and confer session, the Court finds that Defendant's counsel told her at that time that if she

wanted to contact current employees, that she needed to go through counsel.  (ECF No. 90-6, p.

44; Tr. 321-323).  When so told, Plaintiff summarizes her understanding of this protocol, and then

she says "Okay. That's perfect. That will work. That's great."  (ECF No. 90-6, p. 44; Tr. 323).

Thus, Plaintiff was on notice in April that if she wanted to depose Defendant's employees that she

would need to contact counsel.  The Court further finds that, as a factual matter, by the time that

the parties initially agreed to Mr. Taylor's deposition, discovery had closed; thus, counsel for

Defendant is correct that if Plaintiff wanted to depose him, leave of court would be required.  Given

the fact that the Court previously granted the parties' joint requests for extensions of time, Plaintiff

could have chosen to depose Mr. Taylor.  The record reflects that Plaintiff declined to do so

because she did not want any "delay," and she opted instead to subpoena or call him during trial.

(ECF No. 90-4, p. 3).

       In sum, based on these facts, the Court does not find clear and convincing evidence of any

misconduct by the Defendant related to Mr. Taylor's declaration that warrants sanctions.

       5.   *Transcript of Meet and Confer Session*

       Finally, Plaintiff complains that Defendant has engaged in misconduct by not "paying for

and providing the Plaintiff with the original copy of the transcript from the court-ordered Meet and

Confer held on April 10th with a Court Reporter."  (Motion, p. 31).

       The record reflects that the Court did order the Defendant was directed to cover the costs

of the court reporter for the meet and confer.  (ECF No. 72).  The record also reflects that Defendant

ordered an expedited copy of said transcript in April, but that Plaintiff only received a link to that

transcript in May after she requested it.  (ECF No. 90-6, pp. 6-8).  The evidence before me contains

a certification from the court reporter that the transcript is accurate.  (ECF No. 90-6, p. 55; Tr.

449).

       The Court further finds that there is no evidence before it that Plaintiff contacted Defendant

in April 2023.  Although it could be perceived as unkind of the Defendant to not automatically

forward a copy of said transcript to Plaintiff when it ordered it, there is no evidence before me that

Plaintiff expressed interest in receiving a transcript until May.  (ECF No. 90-6, pp. 7, 8).

In sum, clear and convincing evidence does not exist that Defendant engaged in misconduct related to a copy of the transcript.

## III.   CONCLUSION

For the reasons cited herein, the Motion, ECF No. 90, is granted in part, denied in part.

In addition, ECF No. 95 is granted.

A separate Order follows.


Date: August 7, 2024                                   _____
                                                        /s/
                                                        The Honorable Gina L. Simms
                                                        United States Magistrate Judge